**LEXINGTON INSURANCE CO.,**
**Plaintiff–Appellee,**

v.

**COOKE'S SEAFOOD, Defendant,**

**Snooper Fleet, Inc., et al.,**
**Defendant–Appellant.**

No. 87–8043.

United States Court of Appeals,
Eleventh Circuit.

Jan. 19, 1988.

Barnard M. Portman, Paul H. Felser, Savannah, Ga., for defendant-appellant.

Robert S. Glenn, Jr., Hunter, Maclean, Exley & Dunn, P.C., Savannah, Ga., for plaintiff-appellee.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge.

The unfortunate destruction of the F/V C–JACK by Hurricane Juan in the Gulf of Mexico in October 1985 precipitated this case. Appellant Snooper Fleet, Inc. (Snooper) owned the C–JACK; John Hogan, a commercial fisherman with twenty years of experience, captained the C–JACK during the pertinent events. Appellee Lexington Insurance Co. (Lexington) issued a marine hull insurance policy on the C–JACK. This declaratory judgment action concerns the operation of the following provision in that marine insurance policy:

> NAVIGATION WARRANTY: confined to the inland and coastal waters of the United States from Cape Hatteras, North Carolina to Brownsville, Texas not exceeding 100 miles offshore, excluding all territorial waters of Cuba or Mexico.

On Thursday, October 24, 1985, the C–JACK left Galveston, Texas purportedly to fish in an area known as the West Flower Garden Banks, approximately ninety miles from Galveston. In the early morning of the 25th, the sound of the engine roused Hogan, who noticed that the C–JACK had lost speed. Indeed, the C–JACK had slowed from its normal speed of 7–8 knots to only 2–3 knots. Suspecting that contaminated fuel had clogged the vessel's oil filters, Hogan installed two replacement filters, but contaminants in the fuel soon clogged them as well.

It is unclear how far the C–JACK was from Galveston at this time,[1] but it is undisputed that Captain Hogan decided not to return to Galveston to obtain more oil filters but to proceed to a nearby manned oil rig, the ZAPATA NEPTUNE. The ZAPATA NEPTUNE was outside the 100–mile navigation limit of the insurance policy that Lexington had issued to Snooper. Hogan tied the C–JACK up at a buoy next to the ZAPATA NEPTUNE and called the rig's supply vessel about the possibility of obtaining replacement oil filters. The supply vessel did not have the filters that the C–JACK needed, but Hogan was told that the supply vessel was heading to port and could obtain replacement filters the next day.

At this point, the seas were not very rough. During Friday and Saturday, however, the seas began to rise, and on Saturday Hogan learned that a tropical depression to the south of the C–JACK had been upgraded by the National Weather Service to hurricane status and was moving in the direction of the C–JACK. The hurricane bore down on the C–JACK and the ZAPATA NEPTUNE so quickly that workers were unable to evacuate the rig, as would

---

1. The district court found Captain Hogan's testimony to be inconsistent on this point. At his deposition, Hogan estimated the distance from shore as between 50 and 60 miles. He also testified that the C–JACK reached the ZAPATA NEPTUNE in four to five hours, which, according to the district court's calculations, suggested that the C–JACK was 85 to 90 miles from shore when Hogan learned of the engine difficulties. Finally, the district court noted that the transcript of Hogan's interview with insurance adjustor Fred Woodruff leads one to conclude that the C–JACK may have been 105 miles from shore when the engine problems arose. These inconsistencies understandably made the district court skeptical about Hogan's testimony that he had decided not to return to Galveston out of concern that the C–JACK might strike an unmanned oil rig.

be customary. The four persons aboard the C–JACK rode out the storm until the morning of Sunday, October 27, when they abandoned ship. The crew of another supply vessel that had moored by the ZAPATA NEPTUNE pulled them out of the water. Immediately thereafter, the C–JACK broke loose, drifted away, and presumably sank.

In late 1985, Fred Woodruff, an independent adjustor handling claims for Lexington, interviewed Hogan by telephone to obtain information concerning an injury claim by a crew member.[2] At the time of the interview, taped and transcribed by Woodruff, Hogan was in a bar having a drink. According to Woodruff's testimony at trial, Hogan told him that "he went to where he was going and never moved again. That he went to the place he was fishing." Woodruff got the impression that Hogan had intended all along to fish out near the ZAPATA NEPTUNE, and that the problems with the oil filters had not caused him to change his plans. Woodruff also testified that Hogan told him that he had not known about the 100–mile limit in the insurance policy, and that had he known about the limit he would not have sailed the C–JACK, because the fish he was seeking could not be found within 100 miles of shore.

Lexington filed this declaratory judgment action against Snooper on February 19, 1986. The complaint alleged that the insurance policy issued to Snooper was void because the C–JACK was beyond the 100–mile territorial limit on coverage at the time of the sinking. In a deposition Hogan testified that he had proceeded to the ZAPATA NEPTUNE instead of returning to Galveston on learning of the oil filter problem because the C–JACK had little power; without power the C–JACK might hit one of the many unmanned oil rigs on the way back to Galveston. Hogan testified that his reason for going to the oil rig was "to

make repairs." Hogan also testified, however, that he did not contact the Coast Guard because "[a]t the time, I didn't think I was in any trouble," and that he didn't return to Galveston because

> It wasn't a life threatening situation, to begin with. There was no threat of a storm. I did have some replacement filters. So, in a situation like that when you're at sea, you affect [sic] your repairs and continue on with your work. You can't be turning around and running to the dock every time you run into a little problem.

At trial Hogan was unavailable to testify. Although the parties had understood that Hogan's deposition testimony would be used at trial, when Lexington's attorney moved to introduce Woodruff's tape and transcript of his interview of Hogan, the defense attorneys objected. The trial court overruled the objection and entered judgment for Lexington. This appeal followed.

## I.

The central issue on appeal is the effect of the navigation warranty on the insurance coverage for the C–JACK. Lexington points out that when the C–JACK was tied up by the ZAPATA NEPTUNE, it was outside the 100–mile navigation limit expressly warranted by the insurance policy; as a result, Snooper was in breach of warranty and the insurance coverage was voided. Lexington correctly notes that admiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss. *Aguirre v. Citizens Casualty Co. of New York*, 441 F.2d 141, 143 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971);[3] *accord Home Insur-*

---

2. Woodruff testified at trial that he thought the interview took place on December 16, 1985. At Hogan's deposition, counsel for Lexington asked Hogan if he remembered a telephone interview with Woodruff on December 27, 1985. In its brief, Snooper states that the interview took place on November 9, 1985.

3. The Eleventh Circuit, in the in banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*ance Co. v. Ciconett,* 179 F.2d 892, 894 (6th Cir.1950); *Canton Insurance Office v. Independent Transportation Co.,* 217 F. 213, 217 (9th Cir.1914); *Capital Coastal Corp. v. Hartford Fire Insurance Co.,* 378 F.Supp. 163, 172 (E.D.Va.1974).

■ It is also true, as Snooper argues, that admiralty law has always shown hostility towards a rule that would require the master of a vessel to choose between preserving lives at sea and preserving insurance coverage. For example, in *The Iroquois,* 118 F. 1003 (9th Cir.1902), *aff'd on other grounds,* 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955 (1904), the court held that the master of the Iroquois had been negligent in refusing to bring an injured sailor to port to obtain medical attention. The court rejected the argument that the master would have breached the implied warranty against deviation and invalidated the Iroquois' insurance coverage by departing from the vessel's course.[4] *See also Mason v. The Blaireau,* 6 U.S. (2 Cranch) 240, 257 n. 1, 2 L.Ed. 266, 272 n. 1 (1804) (reported observation of Chief Justice Marshall); *The Henry Ewbank,* 11 F.Cas. 1166, 1174 (C.C. D.Mass.1833) (No. 6376) (Story, Circuit Justice); *Bond v. The Cora,* 3 F.Cas. 838, 840 (C.C.D.Pa.1807) (No. 1621) (Washington, Circuit Justice); *Peterson v. The Chandos,* 4 F. 645 (D.Or.1880); *Crocker v. Jackson,* 6 F.Cas. 829, 830 (D.Mass.1847) (No. 3398). *See generally* Note, 11 Cornell L.Q. 385 (1926).[5]

In this case, however, the district court found that "Captain Hogan's decision to proceed to the oil rig was not motivated by fear of Hurricane Juan but rather was influenced by his desire to effect repairs and to not be delayed in the performance of his, and the vessel owner's, business by the occurrence of a 'little problem.'" This finding is not clearly erroneous. When Hogan decided to head for the ZAPATA NEPTUNE, he was concerned about minor repairs, not the stress of weather. Furthermore, although Hogan testified that proceeding back to Galveston at reduced power might have endangered the vessel because of the possibility of striking unmanned oil rigs, the district court found that feasible alternatives were available, such as contacting the Coast Guard, seeking out a manned rig closer to shore, or proceeding to a "safety fairway" offering a clear channel to Galveston. Any of these alternatives would have kept the C–JACK within the warranted geographic limits and would have preserved life.[6] Leaving the warranted geographic limits was not, as one commentator has put it, an "unavoidable necessity." Note, 11 Cornell L.Q. at 389.

■ As the district court observed, navigation warranties ensure that when "little problems" arise on "little vessels," the masters will seek refuge close to shore where the vessels will be exposed to fewer risks than they would meet on the high seas. Even assuming, as Snooper argues, that this policy is outweighed by a policy favoring the preservation of life at sea, the record in this case does not demonstrate that Captain Hogan's actions were actually influenced by the necessity of preservation of life. Accordingly, Snooper has not es-

---

**4.** "We are not aware that any court has ever held that a proper departure from the insured course for necessary treatment of a sick or wounded seaman operates to release an underwriter." *The Iroquois,* 118 F. at 1005 (citing cases).

**5.** Lexington notes that these authorities concern the implied warranty against deviation inherent in all marine insurance contracts rather than express warranties. However, the law of marine insurance strictly enforces implied warranties as well as express ones. *See, e.g., Gulfstream Cargo, Ltd. v. Reliance Insurance Co.,* 409 F.2d 974, 983 & n. 28 (5th Cir.1969). The authorities clearly interpret the doctrine permitting the preservation of life as an exception to the otherwise strict enforcement of a warranty.

**6.** Nothing in the record of this case demonstrates any circumstances that would have made these other alternatives impossible. Although Snooper argues that the C–JACK "may well have been" outside the range of marine VHF distress coverage, *see* 47 C.F.R. § 80.15(e)(2)(ii) (1986), Hogan did not testify that he tried and failed to reach the Coast Guard by radio, or that he considered such an attempt to be pointless.

tablished an excuse for its breach of the navigation warranty.

## II.

Snooper also raises evidentiary points on appeal. Snooper first argues that the trial court erred in admitting as substantive evidence statements that Hogan made over the telephone to Woodruff. According to Snooper, these statements are hearsay and are not admissible as substantive evidence, although Snooper does concede that the statements could be used to impeach Hogan. The trial court ruled that Snooper had waived its right to object to Hogan's statements because it had failed to file a written objection to the introduction of the statements before the pretrial conference, as required by the court's pretrial order.

Snooper counters that it did object to the introduction of Hogan's statements at the pretrial conference. As Snooper interprets the transcript of the pretrial conference, the district judge and the parties first discussed the admissibility of another crew member's statement. The court indicated, "That would not be admissible unless it was res gestae if an adjustor took it.... [H]e is not a party." The discussion then moved on to Captain Hogan's statement, which, Snooper argues, raised the same issues of admissibility: when counsel for Snooper stated that Hogan's statements *could* be used for impeachment, he implicitly objected to the introduction of the statements as substantive evidence. At the trial, Snooper's attorney first contended that at the pretrial conference Snooper had objected to the admission of Hogan's statements, but then stated that Snooper had not objected because Snooper could not anticipate all the possible uses that Lexington would make of Hogan's statements.

■ Snooper's insistence that it had objected to Hogan's statement at the pretrial conference has some merit; nonetheless we do not think that the district court abused its discretion in ruling that Snooper had waived its objections. Snoop-

er does not dispute that it failed to raise its objections in writing, and it certainly was well within the trial court's authority to require that objections be made in writing and to hold the parties to this requirement when the issues were joined at trial. *See Hodges v. United States*, 597 F.2d 1014, 1017–18 (5th Cir.1979). Given the vast number of details competing for the attention of a federal district judge, reducing all issues to writing before the pretrial conference substantially assists the trial court in its ability to understand the issues and to prepare for trial. Discussing Federal Rule of Civil Procedure 16 (Pretrial Conferences), the Advisory Committee on the Federal Rules of Civil Procedure noted, "Counsel bear a substantial responsibility for assisting the court in identifying the factual issues worthy of trial. If counsel fail to identify an issue to the court, the right to have the issue tried is waived." Notes of Advisory Committee on Rules, 1983 Amendment. The same policy applies to informing the trial court of the legal issues worthy of trial.

Moreover, Snooper's argument that it could not have anticipated all possible uses that Lexington could make of Hogan's statements is weak. Snooper could well have anticipated that Lexington would try to introduce the statement as substantive evidence. Lexington listed Hogan's statement in the pretrial order as a document to be introduced; Lexington gave no indication that it would agree to limit the introduction of the statement to impeachment purposes. Snooper should not have assumed that Lexington would be so complaisant.

■ Snooper next contends that, even if Hogan's statement was admissible for purposes of impeachment of his deposition testimony, Lexington nonetheless failed to lay a proper foundation for the statement as required by Federal Rule of Evidence 613. Rule 613(b) requires in part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to

explain or deny the same." The transcript of Hogan's deposition does leave one with the impression that, although Lexington's lawyer asked Hogan if he remembered the telephone interview by Woodruff, counsel did not present Hogan with the *substance* of the statement and ask Hogan to admit, deny, or explain the *substance* of the statement.

The kind of foundation required by Rule 613(b) is not required, however, when the statement is introduced as the admission of the agent of a party opponent. Fed.R. Evid. 613(b); *cf.* Fed.R.Evid. 801(d)(2)(D). Snooper objected at trial that the statement was not admissible as an admission of an agent because Hogan was no longer in Snooper's employ at the time that he made the statement. The record does not reveal, however, that Snooper ever made any objection in writing to Hogan's statement on these grounds before the pretrial conference, as required by the pretrial order. Snooper certainly could have foreseen that Lexington would try to introduce the statement as an admission; the attorneys and the trial judge discussed this issue at the pretrial conference. Given that the trial judge had required the parties to submit their objections in writing, the judge did not abuse his discretion by overruling the objection as waived.

The judgment of the district court is AFFIRMED.