**GREAT LAKES REINSURANCE (UK), PLC, Plaintiff**

v.

**Elaine Y. ROSIN and Bank of the West, Defendants.**

Case No. 08–60399–CIV.

United States District Court, S.D. Florida, Miami Division.

July 30, 2010.

---

Steven Eric Goldman, Goldman & Hellman, Fort Lauderdale, FL, for Plaintiff.

James W. Beagle, James Beagle, P.A., Fort Lauderdale, FL, for Defendants.

FINDINGS OF FACT & CONCLUSIONS OF LAW

ADALBERTO JORDAN, District Judge.

In this Rule 9(h) admiralty action, Great Lakes seeks a declaratory judgment that its marine insurance policy affords no coverage for an incident that caused Elaine Rosin's vessel to sink. Great Lakes argues, in part, that maritime law or New York law governs, that the policy contains an express warranty according to which only certain persons would operate the vessel, and that it is entitled to judgment because at the time of the incident the vessel was operated by Ms. Rosin's son, Paul, who was not a "named operator" or "covered person" under the policy. Ms. Rosin, who filed a counterclaim on the issue of coverage, contends that Florida law applies, and that Paul's operation of the vessel does not void or preclude coverage under Florida law.[1]

---

1. Ms. Rosin initially filed a third-party claim against T.L. Dallas (Special Risks) Ltd., but then withdrew that claim and any objection to entry of judgment in favor of T.L. Dallas. As a result, the claim against T.L. Dallas is not discussed in this order.

The case was tried in mid-August of 2009, and the parties filed their post-trial memoranda in late October of 2009. This order contains my findings of fact and conclusions of law pursuant to Rule 52(a).

## I. FACTS

Great Lakes, a UK-based marine insurance company which is an approved surplus lines carrier in Florida, issued a policy of marine insurance in 2007 to Ms. Rosin in the amount of $175,000.00 on a 2003 36-foot Doral power vessel named the "Queen of Hearts." Great Lakes was bound by the policy issued through authority granted to T.L. Dallas, its underwriting and claims handling agent. T.L. Dallas decided to issue Great Lakes' policy in reliance on the representations made in the application materials submitted by Ms. Rosin. USI Florida/Kolisch was the retail surplus line broker acting as an agent on behalf of Ms. Rosin, and did not have the ability to set rates or bind coverage for Great Lakes.

### A. MS. ROSIN'S APPLICATION FOR COVERAGE

Ms. Rosin is an experienced vessel owner and boater. In the last 25 years, she has owned five vessels of between 21 feet and 42 feet (including the "Queen of Hearts"). She has also taken a number of navigation/safety courses, including the Pompano Power Squadron course and several Ohio Coast Guard courses.

In late 2006 or early 2007, Ms. Rosin learned that her marine insurance policy for the "Queen of Hearts" was not going to be renewed by Safeco Insurance. In January of 2007 she contacted Joseph Kolish at USI, who had previously helped her obtain coverage for that vessel. Mr. Kolish gave Ms. Rosin an insurance application to complete. Testimony at trial indicated that Great Lakes was the only carrier available at the time for Florida vessel owners whose policies were not renewed by Safeco Insurance.

One of the sections of the application asked that operators of the vessel be listed, using the following language: "OPERATORS (ALWAYS LIST INSURED AS OPERATOR # 1) ALL OPERATORS MUST BE DETAILED—USE SEPARATE SHEET IF NECESSARY/PLEASE NOTE THIS OPERATORS INFORMATION CONSISTS OF THREE PARTS (A, B, & C)." Subsections A, B, and C each contained three lines: Subsection A asked for the operator's name, date of birth, state of residence, and violations/suspensions (including auto) in the last five years; Subsection B asked for each operator's boating qualifications, years of boat ownership, and years of boating experience; and Subsection C asked for details of previous vessels owned.

B.A. Usher of Osprey Holdings (which had merged with T.L. Dallas by the time of trial) testified that, as an underwriter for Great Lakes, he wanted to know all possible and intended operators of a vessel. The operator or operators of a vessel (and their experience and safety history), he explained, is one of the factors that T.L. Dallas took into account in deciding whether to issue a policy and, if so, what premium to charge or what conditions to impose. The other factors T.L. Dallas considered were the size, condition, and value of the vessel; the place where the vessel was kept; and the navigational limits of the vessel.

Before submitting the application, Ms. Rosin called USI about the section asking for the listing of operators, which she thought was ambiguous.[2] A representative at USI (but not Mr. Kolish) told her

---

**2.** In prior marine insurance applications with USI, Ms. Rosin had been asked to list only "regular" operators.

that it was not necessary for her to list her son or cousin, who might operate the vessel in an urgent situation if she was not in Florida. The USI representative further told Ms. Rosin that the insurance company was looking for "regular" operators, and not relatives like Paul who would only operate the vessel in an emergency. Thus, when she subsequently filled out the application, Ms. Rosin only listed herself as an operator of the vessel. She did not list her son, Paul, as an operator. *See* Plaintiff's Exh. 4, Yacht Application at 2.

### B. THE POLICY

Great Lakes, through T.L. Dallas, issued Ms. Rosin a policy for the "Queen of Hearts" for the period from February 1, 2007, to February 1, 2008. The policy insured the vessel for $175,000 (minus a deductible of $3,500) for a yearly premium of $3,630. The policy provided "coverage for accidental physical loss of, or damage to, the scheduled vessel which occurs during the period of this insuring agreement and within the limits set out in the insuring agreement declarations page, subject to the insuring agreement provisions, conditions, warranties, deductibles, and exclusions." *See* Plaintiff's Exh. 3 at 2. The policy defines a "covered person" as Ms. Rosin "and/or any person detailed on your application form which has been submitted and approved by us [i.e., T.L. Dallas or Great Lakes], provided that person has been declared to us as an operator of the scheduled vessel." *See* Plaintiff's Exhibit 3 at 1 ¶ c.

The cover note for the policy listed only two warranties: (1) "Warranted no South of Tropic of Cancer;" and (2) "Warranted no known or reported losses as at 8th

February 2007." *See* Plaintiff's Exh. 3, Cover Note at 2. A section of the policy entitled "General Conditions & Warranties," however, also provided that the policy "incorporates in full your application for insurance and, together with any endorsements issued herein constitutes the entire contract between us," and further stated that *"[i]t is warranted that the scheduled vessel will be operated only by covered persons."* *See* Plaintiff's Exh. 3 at 11 ¶ (w) (emphasis added). At trial the parties stipulated that Ms. Rosin's statements in the application were representations, and that the only warranties were those in the policy itself.[3]

The policy also contained a choice-of-law clause. That clause stated that "any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedent of substantive United States Federal Admiralty law and practice, but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the state of New York." *See* Plaintiff's Exh. 3 at 13 ¶ 12. Mr. Usher admitted that this clause was drafted by T.L. Dallas on behalf of Great Lakes, and that Ms. Rosin did not have the ability or leverage to change any of the terms in the Great Lakes policy.

Ms. Rosin testified that she did not receive a copy of the policy until after the "Queen of Hearts" sank. USI has in its file a copy of a March 8, 2007, letter purportedly sending the Great Lakes cover note and policy to Ms. Rosin, but Mr. Kolish does not know if the policy was actually enclosed. Ms. Rosin remembers receiving the letter and the cover note, but

---

**3.** In general terms, a warranty is a assertion of fact in an insurance policy or a representation whereby the insured undertakes that some thing shall or shall not be done, or that some condition will be fulfilled. *See, e.g.,* G. GILMORE & C. BLACK, THE LAW OF ADMIRALTY § 2–7, at 67 (2d ed. 1975); T. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 19–15, at 322 (4th ed. 2004)

testified that the policy was not enclosed.[4] I find that the policy was not sent to Ms. Rosin along with the March 8 letter.

After receiving the March 8 letter and the cover note, Ms. Rosin called USI four times to request a copy of the policy. Although USI told her that a copy would be sent, Ms. Rosin never received a copy, and eventually forgot about the matter. She obtained a copy of the policy only after the vessel sank.

As of early 2007, USI—which was Ms. Rosin's independent broker and agent— had a copy of the policy ultimately issued by Great Lakes to Ms. Rosin. This version of the policy in USI's possession included the "named operator" warranty language found in Ms. Rosin's policy.[5]

### C. PAUL'S UNFORTUNATE JOURNEY

The "Queen of Hearts" was docked in Boca Raton. Because she lived in Ohio part of the time, Ms. Rosin contracted with Greg McElroy of Professional Yacht Maintenance to perform monthly maintenance work on the vessel (e.g., cleaning the bottom of the vessel). Starting with the invoice dated August 7, 2007, and continuing with the invoice dated September 25, 2007, Mr. McElroy advised Ms. Rosin that the "bottom needs to be painted soon!" *See* Deft. Comp. Exh. 5. Furthermore, when he spoke to Ms. Rosin in August of 2007,

Mr. McElroy told her that "it was looking pretty bad." Given that the vessel's bottom had not been painted for one and a half to two years, Ms. Rosin believed that the situation was "urgent" and that she had to get moving.[6] Because she was then in Ohio, she asked her son, Paul, to take the vessel to Govan Marine on the New River in Fort Lauderdale for painting and other routine maintenance. She was very comfortable with Paul's navigational skills, having been on a vessel with Paul as the operator hundreds of times. Paul agreed to take the vessel from Boca Raton to Govan Marine.

In late October of 2007, Paul navigated the vessel from Boca Raton to his home in Fort Lauderdale, Florida, where it stayed for six to seven days. On November 3, 2007, at around 6:00 to 6:30 p.m., Paul piloted the vessel from his home to the South New River Canal to gain access to Govan Marine. Paul chose this route because, using the Canal, it was only a five-mile/45–60 minute trip from his home to Govan Marine.[7]

The Canal is a tricky, man-made, and undredged body of water which has no channel markers or lights. It is also lined by rocks. Those rocks, and other obstructions, are not always visible. The only illumination for the Canal comes from the

---

4. USI's Ana Schultz, who sent the March 8 letter, did not testify at trial. Moreover, the copy of the policy attached to this letter, as contained in USI's files, has a number of pages missing, including the pages with the "named operator" warranty and the choice of law clause.

5. By sending the policy to USI, which was Ms. Rosin's independent agent, Great Lakes complied with its obligations as a surplus lines carrier under Florida law, and the presumption (which Ms. Rosin has not rebutted) is that delivery of the policy to USI constituted delivery to Ms. Rosin. *See Essex Ins. Co. v. Zota*, 985 So.2d 1036, 1050–51 (Fla.2008).

6. Painting helps prevent the penetration and/or deterioration of the gel coat on the bottom of a vessel below the water line.

7. Govan Marine can be accessed through the New River (through the Intercoastal Waterway) or the Canal. Had Paul used the Intercoastal Waterway to reach the New River, it would have taken him just over three hours to arrive at Govan Marine. Captain Donald Govan, the owner of Govan Marine, testified that most people use the New River because the Canal is dangerous.

lights on nearby Interstate 95 and State Road 84. At its narrowest point the Canal is 20 yards and at its widest point is 40 yards. The water in the Canal is between one to six feet deep. The draft of the "Queen of Hearts" (the depth of the keel below the water line) was three to four feet.

Paul had used the Canal once before, with a 34–foot vessel, but had never been on this part of the Canal with his mother's vessel. Paul drove the "Queen of Hearts" at three miles per hour, and did not notice anything unusual on his digital depth finder. Both engines, according to Paul, were working properly.

That day sunset was at 6:38 p.m., and high tide was at 5:51 p.m. Sometime between 6:30 and 7:00 p.m., before it was dark, the vessel's rudder struck something in the Canal. At that time the vessel was about 100–200 yards from Govan Marine. About 45 minutes later, when it had become dark, the vessel began to sink. Paul looked for a pump, to no avail. At around 8:30 p.m., using his girlfriend's cell phone, Paul called 911.

Captain Govan learned of the incident at around 8:00 p.m., and arrived on the scene about 10 minutes later. By then the vessel had sunk because the propeller blades had snapped off and the rudder had been yanked from the vessel. When the engines were pumped out the next day, the key for one of the engines was in the "on" position, and the key for the other was in the "off" position.

### D. PAUL'S NAVIGATIONAL EXPERIENCE & CRIMINAL HISTORY

Paul began boating at the age of 10 with his parents, who stressed safety. He took junior boating classes in Ohio in 1975–76. When he was 12, he drove a 42–foot vessel (one to two hours at a time), and when he

was 15 he was given the keys to a 25–foot Sea Ray. He also later owned an 18–foot boat and a 34–foot Sea Ray, though that latter vessel was not titled in his name. Prior to 2007, Paul had over 25 years of boating experience and did not have any boating accidents.

After the "Queen of Hearts" sank, Paul said that he had operated the vessel about 40 to 50 times. At trial he testified that this figure was an "exaggeration," and that the correct figure was three to four times.

In 2002, Paul pled guilty in Ohio to reckless operation of a watercraft. The underlying incident took place in 2001. At trial Paul explained that he passed too close to another boat during an event in which 4,000 to 5,000 boats were on the Ohio River. He also admitted, however, that "maybe" there was marijuana on his vessel at the time he was cited for reckless operation.

Mr. Usher testified that, had Paul been listed as an operator of the vessel, he would have rejected Ms. Rosin's application. The reason, he explained, was Paul's 2002 conviction for reckless operation of a watercraft. And if he had issued a policy on behalf of Great Lakes, Mr. Usher would have imposed a condition that Paul not operate the vessel. In other words, according to Mr. Usher, the failure of Ms. Rosin to list Paul as an operator was material to the acceptance of the risk by T.L. Dallas on behalf of Great Lakes.

### E. GREAT LAKES AND ITS CONNECTIONS TO NEW YORK

As noted earlier, Great Lakes is an insurance carrier based in the United Kingdom. It is an approved surplus lines carrier in Florida and in 47 other states. In 2007, Great Lakes insured approximately 4,000 of 8,000 vessels in Florida.[8]

---

**8.** As the end of 2007, there were approximate- ly 811,000 registered vessels in Florida. But

Great Lakes has several connections with New York which, in Mr. Usher's view, gave it license to use a choice of law clause applying New York law if there was no entrenched federal admiralty precedent. First, Great Lakes initially applied to be a surplus line insurer in New York. Second, Great Lakes maintains a $100 million trust account at Citibank in New York, and also has an operating account in U.S. funds at Barclays Bank U.S. in New York. Third, Great Lakes retains lawyers based in New York to accept service of process, and the policy issued to Ms. Rosin provides that Great Lakes can be served with process through any senior partner at the firm of LeBouef Lamb et al. in New York City. *See* Plaintiff's Exh. 3 at 13 ¶ 11(a). Fourth, Great Lakes is a wholly-owned subsidiary of Munich Re, which owns American Re, and the offices of both Munich Re and America Re are in New York.

Mr. Kolish, on behalf of USI, did not have any contacts with Great Lakes in New York. He did business with (and still does business with) Great Lakes through underwriters like T.L. Dallas (which has now merged with Osprey Holdings).

## II. Choice of Law: Federal Admiralty Law, New York Law, or Florida Law?

■ The dispute in this case concerns a marine insurance policy issued for a vessel, thereby giving rise to federal admiralty jurisdiction. *See, e.g., St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1184 (11th Cir.2009); *All Underwriters v. Weisberg*, 222 F.3d 1309, 1312 (11th cir.2000). The interpretation of a marine insurance policy is a legal matter for a court. *See Gulf Tampa Drydock Co. v. Great Atlantic Co.*, 757 F.2d 1172, 1174 (11th Cir.1985).

■ When a district court sits in admiralty, federal maritime conflict of laws principles control. *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1161–62 (11th Cir.2009). Eleventh Circuit precedent teaches that, in matters of contract interpretation, these maritime conflict of laws principles call for the application of the law where the contract was made. *See, e.g., Hercules, Inc. v. Stevens Shipping Co.*, 629 F.2d 418, 421 n. 6 (5th Cir. 1980); *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 164 (5th Cir. 1979). *Cf. Weisberg*, 222 F.3d at 1312 ("when neither statutory nor judicially created principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law") (citation and internal quotation marks omitted). In 2004, however, the Supreme Court held that "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk Southern Ry. Co. v. Kirby*, 543 U.S. 14, 22–23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004).

■ It is not necessary to discuss whether *Norfolk Southern* affects the Eleventh Circuit's maritime conflict of laws precedent because this case has a wrinkle; the insurance policy issued by Great Lakes to Ms. Rosin contains a choice-of-law clause requiring application of admiralty law if there is established and entrenched federal admiralty precedent, or New York law if no such federal precedent exists. Although the Eleventh Circuit apparently has not addressed the effect of a choice-of-law provision in a marine insur-

Florida does not require marine insurance, which accounts for the fact that only 8,000

Florida vessels were insured that year.

ance policy, the general rule in the federal courts is that such a provision will be applied unless the state in question "has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purpose of maritime law." *See Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514, 1517 (5th Cir.1988). *Accord Hawkspere Shipping Co. Ltd. v. Intamex, S.A.*, 330 F.3d 225, 233 (4th Cir. 2003); *Chan v. Society Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir.1997); *Neely v. Club Med Management Services, Inc.*, 63 F.3d 166, 197 n. 36 (3rd Cir.1995) *(en banc)*; *Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 766–68 (D.C.Cir. 1992). As the Fifth Circuit put it recently, a "choice of law provision in a maritime insurance contract will be upheld in the absence of evidence that its enforcement would be unreasonable or unjust." *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242 (5th Cir. 2009).[9]

■ I conclude that the policy's choice-of-law provision should be enforced. First, parties to a marine insurance policy, which can be governed by admiralty law, can certainly contract for the application of federal maritime law. Thus, there is nothing problematic about Great Lakes and Ms. Rosin agreeing to have the policy interpreted according to established and entrenched federal admiralty precedent if it exists. Second, the alternative choice of New York law (if there is no established and entrenched federal admiralty precedent) should also be given effect. It is true that Ms. Rosin is a Florida resident, that the vessel was docked in Florida, and that the policy was issued pursuant to Florida's surplus lines laws. But New York has a sufficient substantial relation-

ship with Great Lakes to allow application of New York law: Great Lakes first applied to be a surplus line carrier in New York; Great Lakes maintains bank accounts in New York; Great Lakes accepts service of process through attorneys in New York, as reflected in the policy issued to Ms. Rosin; and Great Lakes is a wholly-owned subsidiary of Munich Re, which owns American Re, and the offices of both of those insurance companies are in New York. Like other courts which have addressed this precise issue, I conclude that on this record there is no basis to disregard the policy's alternative choice of New York law. *See, e.g., Great Lakes Reinsurance*, 585 F.3d at 244 (applying choice of law clause in marine insurance policy issued by Great Lakes specifying admiralty law or New York law because Great Lakes had most substantial relationship with New York, maintained an agent in New York for service of process, and kept its U.S. trust account in New York: "Durham has not carried its burden of showing that the application of New York law, as provided in the policy, would be unreasonable or unjust."); *Great Lakes Reinsurance (UK) PLC v. Sea Cat I, LLC*, 653 F.Supp.2d 1193, 1199 (W.D.Okl.2009) (applying choice of law clause in marine insurance policy issued by Great Lakes specifying admiralty law or New York law: "The selection of a state that, unlike Oklahoma, has substantive laws and precedents dealing with maritime insurance contracts appears entirely reasonable under the circumstances."); *Great Lakes Reinsurance (UK) PLC v. Dion*, 2009 WL 5174372, *2 (S.D.Cal.2009) (applying choice of law clause in marine insurance policy issued by Great Lakes specifying admiralty law or New York law because Great Lakes

---

**9.** This is also the view of one of the leading admiralty treatises. *See* SCHOENBAUM, ADMIRAL- TY AND MARITIME LAW § 19–9, at 283.

agreed to be served with process in New York); *Great Lakes Reinsurance (UK) PLC v. S. Marine Concepts, Inc.,* 2008 WL 6523861, *2 (S.D.Tex.2008) (applying choice of law clause in marine insurance policy issued by Great Lakes specifying admiralty law or New York law because Great Lakes had "substantial assets and connections in New York, including the presence of its agent for service").

The fact that Ms. Rosin did not have any ability to change the language in the policy does not mean that the choice-of-law clause should be stricken or disregarded. The Supreme Court, for example, has held that the inclusion of a forum selection clause in a cruise line ticket does not render the clause unenforceable under admiralty law simply because of the passenger's lack of bargaining ability, *see Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 593, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) ("we do not adopt the court of appeals' determination that a non-negotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining"), and the same should hold true for a choice-of-law clause in a marine insurance policy. Aside from the fact that New York law is not as favorable to her as Florida law, Ms. Rosin has not shown that application of the choice-of-law clause is unjust or improper. *Cf. Flores v. American Seafoods Co.,* 335 F.3d 904, 918 (9th Cir.2003) (although seamans' agreement was an adhesion contract, choice of law clause in agreement would be applied where seamen had not shown that application would result in substantial injustice).

I now turn to whether there is established and entrenched federal admiralty precedent concerning the breach of a "named operator" warranty, and if not, what New York law says on that issue.

### III. IS THERE ENTRENCHED FEDERAL PRECEDENT UNDER *WILBURN BOAT & KOSSICK?*

More than 75 years ago, the former Fifth Circuit interpreted a warranty in a marine insurance policy under federal admiralty law, and held that the vessel owner could not recover on the policy because the warranty—a warranty as to where the vessel would be located—had been breached. This result was required, said the former Fifth Circuit, even though the place where the loss occurred was "quite as safe as the one named in the policy." *See Robinson v. Home Ins. Co.,* 73 F.2d 3, 4 (5th Cir.1934). *Robinson* in essence declared that breach of a warranty in a marine insurance policy would void coverage as a matter of federal admiralty law, even in the absence of any relationship between the breach and the loss.

Two decades later, however, the Supreme Court decided *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), a case that has since created confusion and turmoil as to warranties in marine insurance policies. The case involved a houseboat on an inland lake whose insurance policy contained warranties against change of ownership and commercial use. *See id.* at 311, 75 S.Ct. 368. Both warranties were breached, and the boat was subsequently destroyed by a fire not related to or caused by the breaches. *See id.* The owners of the boat made a claim under the policy, but the insurer denied coverage based on the breaches of the warranties. *See id.* The owners argued that the statutory law of Texas should apply, and they claimed that under Texas law a breach of warranty was not a policy defense unless it contributed to the loss. *See id.* at 312, 75 S.Ct. 368. The lower courts ruled in favor of the insurer, holding that, under federal admiralty law (as interpreted in cases like *Robinson* ), a

breach of a warranty voids coverage regardless of any connection between the breaches and the loss. *See id.* at 313, 75 S.Ct. 368.

The Supreme Court reversed. It held that, in the field of marine insurance, state law, instead of federal maritime law, should be applied *where there exists no judicially established federal admiralty rule on the issue. See id.* at 320, 75 S.Ct. 368. Notably, the Supreme Court said that not "every term in every maritime contract can only be controlled by some federally defined admiralty rule," and added that "the National Government has left much regulatory power in the States .... in relation to insurance companies and the contracts they make." *See id.* at 313–14, 75 S.Ct. 368. The Supreme Court specifically ruled that there was *no* established federal admiralty rule "requiring strict fulfillment of maritime insurance warranties," *see id.* at 314–16, 75 S.Ct. 368, and, importantly, declined to fashion such a federal rule. The result was that Texas law—and not federal admiralty law—applied to determine the effect of the owners' breaches of the warranties in the policy. *See id.* at 321, 75 S.Ct. 368.[10]

Three years later, in *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), the Supreme Court was faced with an alleged oral agreement by a shipowner to assume responsibility for any improper or inadequate treatment of a seaman at a public health hospital. The Supreme Court held that the agreement was maritime in character because the "consideration for [the shipowner's] promise was [the seaman's] good-faith forbearance to press what he considered—perhaps erro-

neously—to be the full extent of his maritime right to maintenance and cure." *Id.* at 738, 81 S.Ct. 886. Then, distinguishing (but not overruling) *Wilburn Boat*, the Court ruled that the agreement was to be governed by federal admiralty law, and not state or local law: "Nor is *Wilburn Boat* ... apposite. The application of state law in that case was justified by the Court on the basis of a lack of any provision of maritime law governing the matter there presented. A concurring opinion ... and some commentators have preferred to refer the decision to the absurdity of applying maritime law to a contract of insurance on a houseboat established in the waters of a small artificial lake between Texas and Oklahoma. Needless to say the situation presented here has a more genuinely salty flavor than that." *Id.* at 742, 81 S.Ct. 886. (citations omitted).

## A. TAKING *WILBURN BOAT* FOR A RIDE

On remand in *Wilburn Boat*, the former Fifth Circuit read the Supreme Court's opinion to hold "merely that state law is to be applied in the field of maritime insurance only where 'entrenched federal precedent is lacking' with respect to a specific issue." *Fireman's Fund Ins. Co. v. Wilburn Boat Co.*, 300 F.2d 631, 647 n. 12 (5th Cir.1962). The former Fifth Circuit relied in part on *Kossick*, 365 U.S. at 742, 81 S.Ct. 886, for this reading of *Wilburn Boat*. *Accord Koninklyke Nederlandsche Stoomboot Maalschappy, N.V. v. Strachan Shipping Co.*, 301 F.2d 741, 743 (5th Cir. 1962) (although *Wilburn Boat* "held that maritime insurance contracts should be governed by state law, there can be no doubt that a clearly established federal

---

**10.** Justice Frankfurter concurred in the result because of the "localized" nature of the transaction—the houseboat in question was restricted to travel in an artificial inland lake between two states. He believed, however, that the majority had gone too far in using

language that allowed state law to govern the interpretation of marine insurance policies in situations affecting the national and international aspects of shipping. *See Wilburn Boat*, 348 U.S. at 322–24, 75 S.Ct. 368 (Frankfurter, J., concurring).

judicially-fashioned maritime rule governs a stevedore's breach of warranty to perform services in a workmanlike fashion").

In the wake of *Wilburn Boat,* the former Fifth Circuit decided a number of cases acknowledging that state law generally governs the interpretation of marine insurance policies. *See, e.g., De Bardeleben Marine Corp. v. United States,* 451 F.2d 140, 147 n. 18 (5th Cir.1971); *Walter v. Marine Office of America,* 537 F.2d 89, 94 (5th Cir.1976). In other marine insurance cases, the former Fifth Circuit concluded that it did not have to decide choice-of-law issues because both state and federal law were the same. *See, e.g., Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974, 981–82 (5th Cir.1969); *Progress Marine, Inc. v. Foremost Ins. Co.,* 642 F.2d 816, 819 (5th Cir.1981).

In time, the former Fifth Circuit began to express some doubts about the *Wilburn Boat* preference for state law in matters of marine insurance, and began using a type of balancing test to resolve choice of law issues. For example, in *Irwin v. Eagle Star Ins. Co.,* 455 F.2d 827, 829–30 (5th Cir.1972), the panel, applying *Kossick,* inquired as to whether the state in question had a "substantial and legitimate interest" in having its law applied. The same approach was followed in *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.,* 632 F.2d 424, 429 (5th Cir.1980).

In *D.J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.,* 608 F.2d 145, 147 (5th Cir. 1979)—a case involving an *implied* warranty of seaworthiness—the former Fifth Circuit applied federal admiralty law and held that a breach of the warranty voided the policy. It explained that *Wilburn Boat* did not require application of Louisiana law because the Circuit had long acknowledged "the existence of a federal maritime rule extending an implied warranty of seaworthiness to a maritime hull insurance policy. In light of this rule, we are not prevented by the *Wilburn* holding from deciding the case with reference to established federal maritime rules governing the warranty involved." *See id.* at 147 n. 1. This decision was consistent with an earlier former Fifth Circuit case, *Aguirre v. Citizens Casualty Co. of New York,* 441 F.2d 141, 143 (5th Cir.1971) (holding that *Wilburn Boat* was inapplicable in a case involving an express warranty of seaworthiness, because the "seaworthiness standard is solidly entrenched in federal maritime jurisprudence").

Less than a year after *D.J. McDuffie,* the former Fifth Circuit appeared to turn *Wilburn Boat* on its head. It held that the construction of a marine insurance contract "is normally governed by federal rather than state law." *See M.O.N.T. Boat Rental Services, Inc. v. Union Oil,* 613 F.2d 576, 579 n. 6 (5th Cir.1980) (citing to *Wilburn Boat,* but only with a "cf.").

The interpretive saga continued after the creation of the Eleventh Circuit with *U.S. Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832 (11th Cir.1984), a case involving a breach of a warranty that the vessel would not be taken beyond certain territorial limits and a covered loss (a fire) unrelated to the breach. Both the majority opinion and the dissenting opinion applied federal law to the breach of warranty issue, and discussed the former Fifth Circuit's 1934 *Robinson* decision (which, as noted earlier, had applied federal admiralty law to a breach of warranty). *See, e.g., id.* at 835. Yet only two years after *U.S. Fire* the Eleventh Circuit reaffirmed the core holding of *Wilburn Boat* in marine insurance cases in *Steelmet, Inc. v. Caribe Towing Corp.,* 779 F.2d 1485, 1488 (11th Cir.1986): "One must identify the state law involved and determine whether there is an admiralty principle with which the state law conflicts, and, if there is no such admiralty

principle, consideration must be given to whether such an admiralty rule should be fashioned. If none is to be fashioned, the state rule should be followed. If there is an admiralty-state law conflict, the comparative interests must be considered—they may be such that admiralty shall prevail, as in *Kossick,* or if the policy underlying the admiralty rule is not strong and the effect on admiralty is minimal, the state law may be given effect, as in *Olympic Towing [Corp. v. Nebel Towing Co.,* 419 F.2d 230 (5th Cir.1969) ]."

In sum, as of 1987 the Fifth and Eleventh Circuits had said very different things about the scope and effect of *Wilburn Boat* in marine insurance cases. *See Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 887 n. 3 (5th Cir.1991) ("Our Circuit has taken varying, and arguably inconsistent, approaches to the precedential authority of *Kossick* [.] In at least one opinion this Court assumed that *Kossick* limited *Wilburn Boat* to its facts. In another case, however, the Court severely criticized and declined to follow the *Kossick* opinion, concluding that it only contributed confusion to the question whether maritime law controlled the interpretation of marine contracts. Still other cases ignore *Kossick* altogether.") (citations omitted).

## B. "NAVIGATION LIMIT" WARRANTIES IN THE ELEVENTH CIRCUIT

In 1988, a mere two years after *Steelmet,* the Eleventh Circuit had another opportunity to address the impact of *Wilburn Boat* on what law should be applied to warranties in marine insurance policies. The case was *Lexington Ins. Co. v. Cooke's Seafood,* 835 F.2d 1364 (11th Cir.1988), and the issue was the effect of the breach of a navigation limit warranty (a geographical limitation on where the vessel could be operated) where the vessel was lost in a hurricane after going beyond the permissible area of navigation. The Eleventh Circuit stated that "admiralty law requires the strict construction of express warranties in marine insurance contracts," and held that "breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have voided the loss." *See id.* at 1367. For support, the Eleventh Circuit cited to the former Fifth Circuit's 1970 decision in *Aguirre*—which involved a seaworthiness warranty—as well as a 1974 district court case and two circuit court cases decided before *Wilburn Boat.* The Eleventh Circuit did not consider whether there was any federally entrenched admiralty rule governing the breach of a navigation warranty that would displace state law under *Wilburn Boat.*

The Eleventh Circuit issued a similar ruling eight years later in *Hilton Oil Transport v. Jonas,* 75 F.3d 627, 630 (11th Cir.1996), which involved a claim of coverage for a vessel wrecked by a storm while outside its trading limits. The panel concluded that breach of such a warranty in a marine insurance policy deprives the insured of coverage, even if the breach is unrelated to the loss, and stated that the "admiralty cases that support this principle are legion and form a judicially established and entrenched federal admiralty rule." *See id.* (citing *Wilburn Boat,* 348 U.S. at 315, 75 S.Ct. 368). "Thus, in the absence of a 'held covered' clause, federal admiralty law, not state law, would control." *See id. See also Home Ins. Co. v. Vernon Holdings,* 1994 WL 791971, *3 (S.D.Fla.1994) (under Eleventh Circuit precedent federal admiralty law, not state law, applies to navigation limit warranties in marine insurance policies).[11]

---

11. Ms. Rosin argues that *Windward Traders,*  *Ltd. v. Fred S. James & Co. of New York, Inc.,*

Interestingly, Florida state courts have also held that federal law governs navigation limit warranties in marine insurance policies. For example, in *Aetna Ins. Co. v. Dudney,* 595 So.2d 238, 239 (Fla. 4th DCA 1992), the Fourth District reversed a trial court for applying Florida law as to the effect of a breach of such a warranty: "State law cannot be utilized to interpret a warranty in a marine insurance contract if the federal judiciary has established a rule as to the interpretation of that type of warranty.... Federal courts have recognized that for over forty years strict construction of navigational limit warranties has been an established admiralty rule of the federal judiciary." (citing *Wilburn Boat,* 348 U.S. at 310, 75 S.Ct. 368, and *Lexington,* 835 F.2d at 1364).

In more recent cases, the Eleventh Circuit has applied state law in cases involving marine insurance policies. Those cases, however, may not mean much with respect to the application of *Wilburn Boat* because the parties apparently agreed that state law governed. *See, e.g., Fireman's Fund Ins. Co. v. Tropical Shipping,* 254 F.3d 987, 1003 (11th Cir.2001); *Continental Ins. Co. v. Roberts,* 410 F.3d 1331, 1333 (11th Cir.2005).

## C. A RECAP

It may be that *Wilburn Boat* was a bad (or at least badly written) decision. As one leading admiralty treatise put it: "It is a true *tour de force* to hold that federal maritime law is supreme in regard to seamen's suits for maintenance and cure and for indemnity to injuries suffered through unseaworthiness, and at the same time to hold that marine insurance is not governed by federal law." GILMORE & BLACK, THE LAW OF ADMIRALTY § 2–8, at 70. But whether incorrectly decided or not, *Wilburn Boat*—which unlike *Kossick* dealt with the effect of warranties in marine insurance policies—has not been overruled and remains on the books. Given that it addressed an issue presented in this case, *Wilburn Boat* cannot simply be ignored.

Like a ship from a World War II fleet, *Wilburn Boat* has been mothballed from time to time in the Eleventh Circuit. It is not at all clear, therefore, how the Eleventh Circuit would analyze a breach of a "named operator" warranty in a marine insurance case today. Indeed, the Supreme Court and commentators have noted the confusion about the dividing line between substantive federal maritime law and state law in admiralty cases. *See, e.g., American Dredging Co. v. Miller,* 510 U.S. 443, 452–53, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994)(comparing *Wilburn Boat* and *Kossick:* "It would be idle to pretend that the line separating permissible from impermissible state regulation is readily discernible in our admiralty jurisprudence, or indeed is even entirely consistent without our admiralty jurisprudence."); SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 19–15, at 326 (explaining three different approaches used by courts after *Wilburn Boat* ); J. Goldstein, *The Life and Times of Wilburn Boat: a Critical Guide (Part II),* 28 J. Marine Law & Commerce 555, 556–70 (Oct. 1997) (describing deficiencies of, and confusion created by, *Wilburn Boat* ); A. PARKS, THE LAW AND PRACTICE OF MARINE INSURANCE AND AVERAGE 239 (1987) ("Clearly, the tendency has been to restrict *Wilburn Boat* to cases involving policy war-

---

855 F.2d 814 (11th Cir.1988), clarified that *Lexington* is not precedent for every case with marine insurance warranties. That argument is not persuasive; in *Windward Traders, Ltd.,* the parties stipulated that Florida substantive law applied, so the Eleventh Circuit did not have to address the issue. *See id.* at 817 n. 3. *See also Home Ins. Co.,* 1994 WL 791971, at *3 (explaining that *Windward Traders, Ltd.* is not inconsistent with *Lexington* ). Nevertheless, as explained in the text, I do not believe *Lexington* is dispositive here.

ranties, and even here the courts are far from consistent. To say that the American courts appear to be reluctant to follow *Wilburn* unless constrained to do so is to understate the case.").

### D. "NAMED OPERATOR" WARRANTIES UNDER FEDERAL LAW

■ Great Lakes argues that there is entrenched federal admiralty precedent concerning the effect of a breach of a "named operator" warranty, and that under such precedent a breach—even if unrelated to the loss—voids coverage. Alternatively, Great Lakes argues that if there is no established rule of federal admiralty law, then this case should be decided under the laws of New York. Ultimately, Great Lakes argues that both federal admiralty law and New York law utilize the "strict or literal compliance" rule according to which breach of an express warranty in a marine insurance policy voids coverage, even if there is no connection between the breach and the loss.

Notwithstanding the confusion concerning the proper application of *Wilburn Boat*, I conclude that there is no established and entrenched federal precedent concerning the effect of a breach of a "named operator" warranty. The only case purporting to recognize a federal rule voiding coverage for such a breach is an unpublished decision from a district court in Alaska, *Albany Ins. Co. v. Jones,* 1996 WL 904756, *4–*5, 1997 A.M.C. 1407, 1410 (D.Alaska 1996), and a single district court case—given the 200 plus years of admiralty precedent this country—does not constitute established and entrenched federal precedent for purposes of *Wilburn Boat* or the policy's choice of law clause.

As noted earlier, the Eleventh Circuit has held, post-*Wilburn Boat,* that federal admiralty law requires strict compliance with certain warranties in marine insur-

ance policies, such as navigation limit and trading limit warranties. *See, e.g., Lexington Ins. Co.,* 835 F.2d at 1367; *Hilton Oil,* 75 F.3d at 630. But if *Wilburn Boat* means anything, it is that a court has to look to see if the *specific* warranty at issue is (or should be) the subject of a uniform or entrenched federal admiralty rule. *See Coastal Fuels Mktg., Inc. v. Fla. Exp. Shipping Co., Inc.,* 207 F.3d 1247, 1251 (11th Cir.2000); *Wilburn Boat,* 300 F.2d at 647 n. 12 (on remand from Supreme Court); *Insurance Co. of North America v. San Juan Excursions, Inc.,* 2006 WL 2635635, *6 (W.D.Wash.2006). With respect to a "named operator" warranty, there is no established and entrenched federal admiralty precedent.

I therefore turn to New York law, as alternatively provided in the policy's choice of law clause.

### IV. BREACH OF EXPRESS WARRANTIES UNDER NEW YORK LAW

■ New York law has long provided that "the breach of an express warranty [in a marine insurance policy], whether material to the risk or not, whether a loss happens through the breach or not, absolutely determines the policy and the assured forfeits his rights under it." *Cogswell v. Chubb,* 1 A.D. 93, 36 N.Y.S. 1076, 1077 (1st Dept.1896) (navigation limit warranty), *aff'd,* 157 N.Y. 709, 53 N.E. 1124 (1899). As New York's Court of Appeals has explained, an express warranty in a marine insurance policy "must be literally complied with, and that noncompliance forbids recovery, regardless of whether the omission had a causal relation to the loss." *See Jarvis Towing & Transp. Corp. v. Aetna Ins. Co.,* 298 N.Y. 280, 82 N.E.2d 577, 577 (1948) (no coverage due to breach of warranty that vessel, when tied up, would be in charge of a competent watchman who would conduct inspections of vessel at frequent intervals). *See also Levine*

*v. Aetna Ins. Co.,* 139 F.2d 217, 218 (2d Cir.1943) (barring coverage where there was breach of warranty that vessel would be equipped with a searchlight); *Kron v. Hanover Fire Ins. Co.,* 15 N.Y.2d 521, 254 N.Y.S.2d 119, 202 N.E.2d 563–64 (1964) (applying literal compliance rule to bar coverage where insured breached warranty that gasoline would not be kept aboard tug). Although a provision of New York's insurance law now provides that a breach of a warranty does not void coverage unless the breach increased the risk of loss, damage, or injury within the coverage of the policy, *see* N.Y. Ins. Law § 3106(b) (McKinney 1985), that provision does not apply to express or implied warranties in a contract of marine insurance relating to the perils and risks of navigation, *see* 3106(c).

■ At the time of the accident, Paul Rosin was operating the "Queen of Hearts." Because he was not a "named operator" or "covered person" under Ms. Rosin's policy, there was a breach of an express warranty. That breach, under New York law, voids coverage for the accident even if Paul's driving of the vessel did not cause or contribute to the accident. *See Ins. Co. of North America v. Zaglool,* 526 F.Supp.2d 361, 367–68 (E.D.N.Y.2007) (under New York law, breach of "named operator" warranty precluded coverage as to the person who was operating vessel and was injured in accident); *Gfroerer v. Ace American Ins. Co.,* 2004 WL 2966173, *4–*5 (W.D.N.Y.2004) (where dangerous vessel was being operated by person other than named operator at time of accident, breach of "named operator" warranty voided coverage for accident under New York

law even though named operator was purportedly supervising the other person's driving of vessel), *aff'd,* 184 Fed.Appx. 26, 2006 WL 1427730 (2d Cir.2006). Thus, Great Lakes has no obligation to pay for the loss of the "Queen of Hearts." [12]

## V. FLORIDA LAW

In an abundance of caution, I will address Florida law as Ms. Rosin urges. Even under Florida law, however, Great Lakes is entitled to a declaratory judgment in its favor.

Florida law provides that a breach by the insured of a warranty in a marine insurance policy does not bar coverage or void the policy "unless such breach or violation increased the hazard by any means within the control of the insured." *See* Fla. Stat. § 627.409(2). The purpose of this statute is to "prevent the insurer from avoiding coverage on a technical omission playing no part in the loss," *Pickett v. Woods,* 404 So.2d 1152, 1153 (Fla. 5th DCA 1981), and to ensure that the breach "significantly alters the risk of loss [the insurer] would be called on to bear," *Fireman's Fund Ins. Co. v. Cox,* 742 F.Supp. 609, 611 (M.D.Fla.), *aff'd,* 892 F.2d 87 (11th Cir. 1989).

Under § 627.409(2), the burden of proving an increase of the hazard is on Great Lakes. *See Florida Power and Light v. Foremost Ins. Co.,* 433 So.2d 536, 536–37 (Fla. 4th DCA 1983). A hazard, for purposes of the statute, concerns "danger to the insured vessel itself." *See Eastern Ins. Co. v. Austin,* 396 So.2d 823, 825 (Fla. 4th DCA 1981).

12. This case does not present a situation where the insured (or another authorized operator of the vessel) becomes seriously ill or incapacitated while operating the vessel, another person on board (who is not a "named operator") is required to take over the piloting duties in order for the safety of all concerned, and the vessel sinks or suffers a loss while that other person is in charge. I therefore do not express any views on such a scenario.

Based on the evidence presented at trial, I conclude that Great Lakes has met its burden and shown that Paul's operation of the "Queen of Hearts" increased the hazard within the meaning of § 627.409(2). First, Paul did not have the experience that his mother had in operating vessels like the "Queen of Hearts." According to his trial testimony, he had only driven the vessel three or four times before the ill-fated journey. Second, Paul had not taken the safety courses that his mother had taken. Third, Paul had pled guilty in 2002 to reckless operation of a watercraft, and admitted at trial that there might have been marijuana on his vessel when he was cited. Fourth, it was Paul who made the reckless decision to take the "Queen of Hearts" to Govan Marine by way of the dangerous and shallow New South River Canal. Fifth, the evidence at trial showed that Great Lakes would not have provided coverage to Ms. Rosin if Paul was a named operator, or at least would have prohibited his operation of the vessel as a condition of issuing a policy. Sixth, the person operating the vessel was material to Great Lakes' assessment of its risk, as demonstrated by the questions on the insurance application about operators. All of these facts indicate that the risk of the "Queen of Hearts" having an accident (e.g., striking something in the Canal) was increased due to Paul's operation, a matter that was within the control of Ms. Rosin. *See Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 190 F.3d 26, 33 (2d Cir.1999) (applying § 627.409(2), and holding that breach of warranty limiting towing activities to yachts up to 50 feet in length increased the hazard because the risks associated with towing were material to the insurer's evaluation of its exposure, and the 50–foot limitation suggested that the insurer considered length to be an indication of the size of that risk); *AXA Global Risks (UK) Ltd. v. Webb*, 2000 WL 33179617, *2 (M.D.Fla.2000) (dicta: placing vessel in water, in breach of warranty that vessel would be "laid up," increased hazard to insurer under § 627.409(2)); *Pettegrove Truck Serv., Inc. v. Transp. Cas. Ins. Co.*, 553 So.2d 234, 235 (Fla. 4th DCA 1989) (Glickstein, J., concurring specially) (breach of warranty requiring submission of all truck drivers' names to insurer for approval "increased the hazard, thus justifying denial of coverage"). This is not a case like *Austin*, 396 So.2d at 825, where the occasional sale of fish caught on a pleasure fishing trip did not have any relevance to the hazard under the policy, which provided that coverage would terminate if yacht was used for other than private pleasure purposes. *Cf. Windward Traders, Ltd.*, 855 F.2d at 818 n. 5 (noting, in dicta, that a breach of a "navigational limit" warranty might be deemed to increase the hazard by any means within the control of the insured, but explaining that even if this were the case, a "held covered" clause in the policy at issue would have provided coverage).

## VI. Conclusion

Under New York law, Paul's operation of the "Queen of Hearts" constituted a breach of an express warranty that voids coverage. Alternatively, under Florida law Paul's operation increased the hazard to the "Queen of Hearts" by means within the control of Ms. Rosin. Either way, Great Lakes is not required to pay for the loss of the "Queen of Hearts." A final judgment will be issued separately.[13]

---

**13.** In light of my resolution of the issues, I do not address Great Lakes' other arguments,

e.g., that Ms. Rosin did not comply with the doctrine of *uberrimae fidei* (i.e., the doctrine of utmost good faith). *See generally HIH Marine Services, Inc. v. Fraser,* 211 F.3d 1359, 1362–63 (11th Cir.2000) (discussing doctrine).