**CAPITAL COASTAL CORPORATION and Bulk Towing Corporation, Plaintiffs,**

v.

**The HARTFORD FIRE INSURANCE COMPANY, Defendant and Third Party Plaintiff,**

v.

**The UNITED STATES of America, Third Party Defendant.**

**Civ. A. No. 73–305–N.**

United States District Court, E. D. Virginia, Norfolk Division.

July 15, 1974.

William E. McCardell, Jr. of Crenshaw, Ware & Johnson, Norfolk, Va., for plaintiffs.

Robert M. Hughes, III, of Seawell, McCoy, Winston & Dalton, Norfolk, Va., for The Hartford, defendant and third party plaintiff.

David V. Hutchinson, Trial Atty., Admr. & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for third party defendant.

## MEMORANDUM OPINION

WALTER E. HOFFMAN, District Judge.

Plaintiff, Capital Coastal Corporation, was the bare boat charterer of the Tug CRISTIE, owned by plaintiff, Bulk Towing Corporation. On August 22, 1972, the CRISTIE left Capital's pier in Berkley and headed for Pig Point which is behind Craney Island and approximately ten miles from Capital's pier.

The CRISTIE's mission was to attempt to refloat a barge which had been beached off Pig Point. The barge was beached while being towed from the Richmond, Virginia, area. It was being towed by the CRISTIE, and Wayne Bailey, the CRISTIE's new captain, made

the decision to beach the barge. He decided on this course of action because the CRISTIE was taking on water in rough seas and one of her engine pumps was running hot.

After beaching the barge, the CRISTIE returned to Berkley, and Capital hired Curtis Bay Towing Company to refloat the barge. Curtis Bay's attempts failed, however, and Capital decided to send the CRISTIE after the barge. Bailey, who had been captain only about a week, was again the tug's master. In addition to Bailey and his two man crew, William Witcher, Vice President and General Manager of Capital, went along. His job was to help oversee the refloating of the barge.

In preparation for this trip, a four inch pump which weighed about ¾ of a ton was taken aboard. This pump was to be used to wash some of the material off the barge so it would be light enough to be refloated. Witcher, Bailey and Yates, a Capital employee who was a crane operator, mechanic and rigger, decided that the best place for the pump would be in the stern area. Accordingly, the pump was lashed down to the centerbit with ¾ inch wire rope center and the two corners were fastened with chains.

The CRISTIE managed to reach Pig Point and refloat the barge. She was on the way back to Capital's pier when, at approximately 2:30 a. m., the rope holding the pump either broke or came unfastened. When this occurred, the pump shifted to the port side causing the CRISTIE to list. In close proximity to this event, the tug lost the water pump on one of her engines and began to take on water.

The tug CHAS. D. McALLISTER, owned by McAllister Brothers, Inc., was passing nearby and heard the CRISTIE's crew yelling for help. The CHAS. D. then approached the CRISTIE. At this time, all of the CRISTIE's crew apparently were on the barge and the tug was apparently hanging from the barge by a small line.[1]

After pushing the CRISTIE to the barge, George Noble, Chief Engineer of the CHAS. D., and George Thompson, Mate of the CHAS. D., boarded the CRISTIE. Noble testified that the CRISTIE was taking on water from the port engine and that he asked someone to shut down the engine. Once this was done, much of the water stopped flowing into the tug. Noble then put the CHAS. D.'s pump on the CRISTIE as the CRISTIE's pumps were inoperative.[2] The CRISTIE was then pumped dry and both the barge and the tug were taken in tow by the CHAS D. The CHAS. D.'s pumps were kept on the CRISTIE throughout the trip to Capital's pier. During this return trip, Noble made a wooden plug which he placed in a leaking hole in the after part of the engine room. He estimated that this plug stopped about 70% of the water which was leaking from this hole. The length of this return trip was approximately one hour and ten minutes.

At trial, both Witcher and Bailey testified that the water came into the tug through the portholes. The three crew members of the CHAS. D., however, testified to the contrary. Richard Garcia, Captain of the CHAS. D., was the first to testify. He stated that he thought the water was coming in through the engine cooling system. Noble's testimony followed Garcia's and was to the effect that the CRISTIE was taking on water from her two engine shafts and the aforementioned hole in the tug. His conservative estimate was that these three areas were leaking at a rate of 45–50 gallons per hour, and he felt the CRISTIE could have sunk from these leaks. Thompson was the last of the three witnesses to testify, and he stated

---

1. These facts were taken from the testimony of the members of the CHAS. D.'s crew. Witcher and Bailey disputed these facts; however, we find their testimony less credible than that of the McAllister witnesses.

2. Witcher testified that he had two 1½ inch pumps on the barge but that it was easier to transfer the pumps from the CHAS. D:

that, as best he could gather, one of the CRISTIE's engines was pumping water into the tug's bilges. He also testified that Noble put a plug in a hole in the tug.

In addition to the conflicting testimony concerning where the water was coming from, there was also a conflict in the testimony related to where the CRISTIE was docked when it arrived at Berkley. Witcher and Bailey claim that the barge was secured to the bulkhead with the CRISTIE lashed outboard of the barge. Garcia, Noble and Thompson, however, testified that when they left Berkley the barge was alongside the bulkhead and the CRISTIE was astern of the barge almost alongside the bulkhead.[3]

The McAllister witnesses also testified that they had to push the barge into the dock and then push the CRISTIE in behind the barge as they were concerned about a sunken barge just off the dock. Additionally, Garcia testified that at 4 a. m. when they left, the tug was listing slightly to port and the first of the flood tide was coming in. He stated that the water was not too choppy and there was a moderate breeze. Garcia also pointed out that as he was leaving he told Capital's employees that the CRISTIE needed watching. Noble also gave Capital's employees a warning as he told Witcher and Bailey that the tug was not in a safe condition and needed watching.

According to Witcher, after the CHAS. D. left, he told Bailey to stay with the CRISTIE until 5:30 or 6 a. m. when the crane operators arrived. As soon as they arrived, Bailey was allegedly supposed to instruct them to reverse the position of the tug and the barge so that the CRISTIE would be next to the pier. Once this was done, the crane operators were supposed to remove the pump. Witcher also testified that he told Bailey not to untie the tug and to pump it if necessary.

After giving these instructions, Witcher went home and went to sleep. He testified that he was awakened between 7 and 7:30 a. m. by Yates who informed him that Bailey was asleep. Upon learning this, Witcher told Yates to awaken Bailey and get instructions from him. Witcher also stated that approximately one-half hour after this conversation he was called and informed the CRISTIE had sunk.

Bailey's testimony concerning the pre-sinking occurrences was substantially the same as Witcher's. He also presented his version of the sinking. Bailey stated that he was awakened around 7 a. m. when the crane operators arrived. After discussing the situation with them, he decided to bring the tug around the barge. He testified that he attempted to accomplish this by taking the bow rope in his hand and walking the tug around the barge. As he was doing this, a Navy tug [4] allegedly passed by, causing a wake which prompted waves to wash up on the CRISTIE.[5] The tug took on more water, and it sank at approximately 7:30 a. m. At this time, Bailey claimed there was a strong wind of about 10–15 miles per hour. He did, however, state that the waves were not very choppy and the water was not very rough.

On the morning of the sinking, N. T. Torbert, who at the time was a marine surveyor with Coast Engineering, went to inspect the tug. At this time, he was acting on behalf of defendant The Hartford Fire Insurance Company. He arrived at Capital's pier between 9 and 11 a. m. He found the CRISTIE partially sunk with her superstructure out of the water and a slight starboard list. Torbert obtained a diver for Capital, and the tug was raised. Subsequent to the

---

3. Noble and Garcia identified Exhibit 2–C as accurately portraying the position of the CRISTIE when they left.

4. The United States was granted a directed verdict as a third party defendant at the conclusion of all of the evidence when it presented sufficient evidence to establish that no Navy tugs were in the area.

5. Captain Garcia testified that vessels do not leave large wakes in this area due to the low speed limits.

raising, Torbert examined the CRISTIE and found a small hole in the plate. There was a wood plug in the hole, and Torbert felt this hole could have let in enough water to have caused the tug to sink. Torbert also found a longitudinal fracture in one plate.

Plaintiffs presented evidence that it cost $1756.00 to raise the tug and the original estimate of $18,310.00, plus a 15% increase, to repair the CRISTIE.[6] Capital is seeking to recover these costs under a $20,000.00 hull insurance policy, and the controversy between the parties concerns whether the sinking was a covered risk. The plaintiffs claim that the sinking was covered under either the "peril of the sea" clause or the "Inchmaree" clause. Defendant counters with the allegations that the CRISTIE sank due to unseaworthiness. Additionally, defendant claims that the "Inchmaree" clause is not enforceable as the plaintiff breached a warranty in the policy which required that a certain named individual be the captain of the CRISTIE.

In order to rule on plaintiffs' claim under the "peril of the sea" clause, we must resolve the conflicting testimony which was presented at trial. The basic conflicts involve the position of the CRISTIE when it was docked and the source of the water coming into the CRISTIE. As we feel the testimony of Bailey and Witcher was less than candid and that of the disinterested McAllister witnesses extremely credible,[7] we find that both of these factual conflicts must be resolved against the plaintiffs. Therefore, we find that the CRISTIE was astern of the barge, and not alongside of it, and that the water was coming into the tug from the leaking hull and engine shafts rather than through any portholes.

Our belief concerning the lack of candor of plaintiffs' witnesses is reinforced by defendant's exhibits 12 and 13. Exhibit 12 is Capital's statement of loss which was submitted by John Twohy, IV,[8] president of Capital Coastal, on September 7, 1972. In this report, Twohy states the following:

On August 22, 1972, tug was outfitted with a heavy mobile pump that was set on the after deck in order to assist in refloating our barge aground off Pig Point. The tug returned with the barge and was tied up. This was about 4:30 A.M. on the morning of August 23, 1972, and all personnel left the tug with the pump aboard and planned on removing the pump after 7:00 A.M. when our crane operator came to work. When our people arrived about 6:50 A.M. the tug was found partially sunk and listing heavy to stbd. We then moved the tug as quickly as possible to dockside for purposes of pumping and raising. We hired a diver to assist us with raising rather than hire a salvor which would have been more expensive. The diver found no holes where water could have entered hull and tug was taken to yard for repairs. We can only assure that during hours tug was unattended, a passing vessel's wake caused shifting of pump causing tug to heel over sufficiently to allow water to enter hull with results of partially sinking and damages sustained to equipment and gear.

Exhibit 13 is Witcher's deposition of September 18, 1973, and in pertinent part reads as follows:

The McAllister reached Berkley with barge and Christie in tow at about four o'clock of the morning of August 23. Christie remained moored to the starboard side of the barge outboard. We decided to wait for daylight to attempt to move the pump. We left one man on watch. This was Wayne Bai-

---

6. It should be noted that part of the repair work was for welded doubler plates to be installed over the holes and thin plates in the bottom near the keel.

7. It should be noted that the testimony of these witnesses is supported by Torbert's testimony and the repair work referred to in footnote # 6, *supra*.

8. Although Twohy submitted the claim, at trial he testified that he received the information in the statement from Witcher and Bailey.

ley the captain of the Christie. He was to be on hand to instruct crane operator how to move the pump after daylight. When Christie was moored and the crew left except for Wayne Bailey the engine room was clear of water and the tug was listing to port with about one foot of freeboard aft. Sometime before six o'clock in the morning of August 23 Wayne Bailey checked the tug and found that it was listing more to port and taking water over the aft deck. She then sank alongside the barge and settled in about ten feet of water. I was called by phone at home and when I reached the tug the pump had gone overboard and the tug was sunk.

■ In light of these conflicting stories and our earlier factual conclusion, we must conclude that Bailey never walked the tug or pumped it out and that it sank from water entering into the hull from leaks in the bottom.

This brings us squarely to the question of whether the sinking was a "peril of the sea." Our finding that the tug sank from a leak or leaks in the hull leads us to the conclusion that the vessel sank from unseaworthiness which is not an insured peril. We reach this decision notwithstanding the fact that plaintiffs are quite correct that "[T]he weight of authorities is that a peril of the sea need not be 'extraordinary' . . . ., it is sufficient if it be a 'fortuitous' event. And 'fortuitous' means a happening by chance or accident."

■ In the present case, however, our findings indicate that this was not a fortuitous event but one that was inevitable.[9] As has been recognized in many cases, the test of inevitability is what distinguishes a peril of the sea from unseaworthiness. An example may be found in Commercial Union Insurance Co. of New York v. Daniels, 343 F. Supp. 674 (S.D.Tex.1972). In *Commercial*, the RANGER, a fishing vessel, sank when it was moored to the dock.

At the time of the sinking, the weather conditions were favorable. When the vessel was raised, it was discovered that the sea valve was open and that this caused the sinking. In holding that the sinking did not fall within the peril clause, the court in quoting from Wigle v. Aetna Casualty and Surety Co., 177 F.Supp. 932 (E.D.Mich.1959), stated:

Insurance policies cover only risks not certainties. Therefore, a policy insuring against "perils of the sea" covers only fortuitous events resulting in loss, rather than events which must happen. Perils of the sea must be "of the sea" and not merely "on the sea."

The court in Reisman v. New Hampshire Fire Insurance Co., 312 F.2d 17 (5 Cir. 1963), also came to the same conclusion when it quoted R. T. Jones Lumber Co., Inc. v. Roen Steamship Co., 270 F. 2d 456 (2 Cir. 1959), as follows:

Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power and which cannot be guarded against by the ordinary exertions of human skill and prudence.

The court also quoted Appleman Insurance Law and Practice, Vol. 5, § 3272, and stated that "a marine policy protects against extraordinary accidents and perils, but not against natural decay and ordinary wear and tear."

The cases cited by plaintiffs also recognize the distinction between perils of the sea and unseaworthiness. An example can be found in Allen N. Spooner and Son, Inc. v. Connecticut Fire Insurance Co., 314 F.2d 753 (2 Cir. 1963). In *Spooner* a seaworthy crane barge being used to raise a sunken tanker collapsed when one of the guy wires supporting the crane parted. The parting was caused by the tilting of the barge which resulted from the swells of a large vessel which passed by as the lifting operation was in progress. The court found that

---

9. Although it is true that the weight of the unbalanced pump may have caused the tug to sink more rapidly, it is also true that a

tug with a hull in this condition was bound to sink unless the condition was repaired.

the loss could have been prevented by the use of side slings and held that the master was negligent in failing to use them.

■ The court also held that the swells were a fortuitous action of the sea, and therefore within the scope of the perils clause. The court, however, went on to say:

> Appellee cites us to Continental Ins. Co. v. Patton-Tully Transp. Co., 212 F.2d 543 (5th Cir., 1954) and Western Assur. Co. v. Shaw, 11 F.2d 495 (3d Cir.), cert. denied, 273 U.S. 698, 47 S. Ct. 93, 71 L.Ed. 846 (1926), which contained language to the effect that ordinary swells are not perils of seas or harbors within the meaning of marine insurance policies. The passages relied on by appellee contain alternate holdings at best, since in both cases, the foundered vessels were unseaworthy. Moreover, both decisions rest on findings that swells and waves were not extraordinary under the circumstances. Both rest on the rule that "[T]here must be some casualty, something which could not be foreseen as one of the necessary incidents of the adventure. The purpose of the policy is to secure an indemnity against accidents which may happen, not against events which must happen." The Xantho, 12 App.Cas. 503, 509 (1887).
>
> Whether the loss resulted from a "necessary incident" of the venture— i. e. from ordinary wear and tear—or from an accident which could not be foreseen depends, of course, on the nature of the vessel and operation involved. Compania de Navegacion Interior, S.A. v. Fireman's Fund Ins. Co., 277 U.S. 66, 80, 48 S.Ct. 459, 72 L.Ed. 787 (1928); Klein v. Globe & Rutgers Fire Ins. Co., 2 F.2d 137 (3d

Cir., 1924). In the present case, Stasch was engaged in an extremely delicate operation. Without the use of side slings, the No. 12 could tilt only three degrees without danger to the derrick. Shipping above and below the site of operations was held up, so as to prevent swells. Under these circumstances, the swells caused by the passing freighter were unanticipated and extraordinary, and constitued a "peril of the sea" within the meaning of the policy.

This language of course indicates that a vessel which sinks from ordinary wear and tear is not covered under the perils clause.[10]

■ In addition to our factual finding that the tug sank due to ordinary wear and tear, there is a further reason for our holding that the CRISTIE was unseaworthy. This reasoning is that when a vessel sinks in calm water, a presumption arises that the vessel was unseaworthy in some particulars and once this presumption attaches, coverage must be denied unless (1) the insured can prove that the vessel was seaworthy before the sinking, thus raising the counterpresumption that the loss was caused by a fortuitous peril of the sea, or (2) the unseaworthy condition was caused by actions or defects falling within the purview of the Inchmaree clause. See *Commercial Union* and *Reisman, supra*. In this case the presumption that the vessel was unseaworthy was not satisfactorily rebutted by the plaintiffs and therefore it must govern.

This brings us to the question of whether the plaintiffs can recover under the Inchmaree clause. Although we have found that the CRISTIE sank from unseaworthiness, it is also probably true

10. See also the case of Frederick Starr Contracting Co. v. Aetna Insurance Co., 285 F. 2d 106 (2 Cir. 1960), cited by plaintiffs. In *Frederick*, the court allowed the insured to recover when a scow struck a mound of hard material and sank. The court stated, however, that: "We think the damage to the scow resulted from a peril of the sea within the meaning of the policy. During the nineteenth century the American authorities clearly established that perils of the sea include damage from grounding during an ebb tide, so long as the damage is not the foreseeably inevitable result of letting the ship take ground."

that Bailey's negligence may have substantially contributed to the sinking.[11]

Assuming arguendo that we were to find that Bailey was negligent and that this negligence was a proximate cause of the sinking, the question facing us would be whether we could allow a recovery under the Inchmaree clause. The problem with allowing a recovery stems from a warranty included within the insurance policy. This warranty is as follows:

> Warranted the master of the Insured vessel shall be captain C. T. Chism and, except in the event of emergency or distress, this policy does not provide coverage which operated by any other master.[12]

In order to rule on the contentions concerning this warranty, we must explore the facts leading to the inclusion of the warranty within the policy and the manner in which the warranty operated. This warranty is a special one, not usually found in defendant's insurance policies. It was included within the policy because defendant determined that Capital was in financial difficulty and the insurer wanted to be certain that Capital would not hire an incompetent captain.

The Hartford's practice was to allow Capital to change captains provided the company was notified of the change and had an opportunity for an expert to evaluate the prospective captain's qualifications. The expert used during the period in question was Torbert. He conducted his investigation by interviewing the prospective captain, questioning his references and past employers, and making a general investigation of his background. Torbert's recommendations would generally be followed by defendant. It was also The Hartford's practice to provide the coverage for the prospective captain as soon as Capital notified the insurance company of the change in captains. This coverage was, however, subject to the expert's subsequent evaluation and, in the event of an adverse report by Torbert, Capital would be notified by the insurer.

With this background, we can now examine the merits of the respective claims. Defendant claims that, since Bailey was not approved, the warranty was breached and the insurance policy was void. Plaintiffs counter with the contention that the warranty was vague and must therefore be construed against defendant. Plaintiffs also claim that The Hartford waived the warranty and that, even if it were in effect, it was not breached as either an emergency existed or the tug was not operational.

As far as the vagueness claim is concerned, plaintiffs are quite correct in stating that if the warranty was vague it should be construed against the insurer. The evidence presented at trial, however, indicates that Capital had a clear understanding of the importance and operation of the warranty. This conclusion is based upon the following correspondence between the parties.

1. In a letter dated December 7, 1971, Preston Blake, Jr., an employee of Marsh and McLennon, The Hartford's Norfolk agent, was informed by Philip G. Moore, The Hartford's Ocean Marine Superintendent, that a report received by the insurance company stated that one B. T. Taylor was the captain of the CRISTIE.[13] In regard to this situation, Moore stated that, "If this is actually the case, this creates a rather unpleasant situation in light of item 2 of endorsement no. 2. Since the report speaks favorably of captain, we will temporarily consider covering binding while the vessel is under his command, and

---

11. Assuming Bailey was at the pier, he may have been able to pump the tug if he had been awake.

12. It is quite clear that the word "which" is a typographical error and that the parties meant the word to be "when."

13. This problem apparently arose under the insurance policy which was prior to the one in question. This earlier policy evidently specified that one McDonald was to be the captain of the CRISTIE.

await your explanation as to what is happening."

2. On January 3, 1972 Blake sent a copy of this letter to Twohy. In a separate covering letter, Blake wrote the following:

Also, you probably recall that the policy contains a provision that each captain must be cleared with the company. The letter notes that a B. T. Taylor is now captain. If this is so, would you be kind enough to let us have some information about his background and qualifications so that we can notify the company. Should he ever be replaced please notify us immediately with information which will enable The Hartford to clear that person to be covered.

John, please don't think I am harping but I feel it is better to have these things out on the table now before a serious claim develops and coverage might be denied because you unwittingly violated both of the warranties.

3. On January 5, 1972, Twohy wrote Marsh and McLennon and advised that Tommy Chism was now the captain of the CRISTIE.

4. On March 1, 1972, Torbert submitted the results of his investigation of Chism to The Hartford.[14]

5. On April 13, 1972 Robert J. Anderson, an employee in The Hartford's Ocean Marine Department, wrote the following to Watt Shields of Marsh and McLennon:

Per our conversation, we agree to temporarily waive the warranty that the tug "Christie" be operated by Captain C. T. Chism. For the duration of Captain Chism's illness, coverage will continue while the vessel is being operated by Eugene Anstett.

It is understood that coverage is subject to Coast Engineering Corporation's approval of Captain Anstett's qualifications.

6. By letter of May 8, 1972, Torbert reported the results of his investigation of Anstett to The Hartford.

 This correspondence forces us to conclude that plaintiffs' contentions concerning vagueness are not well taken. Plaintiffs seem to claim that the warranty was vague as it does not state that it could be waived and does not discuss any procedure for the approval of a new captain. Capital, however, knew that the defendant would allow a substitute captain provided notice was given and a background investigation held. After taking advantage of the defendant's willingness to allow a substitute, Capital cannot now claim that the warranty was vague because the details of the method of substitution were not particularized in the warranty.

 ▪ The same evidence which establishes that the warranty was not vague also establishes that it was not waived. Plaintiffs' main contention concerning the waiver seems to be that it was waived due to the fact that Capital could have obtained temporary coverage for Bailey by calling Marsh and McLennon and giving them notice of the change in captains. Although this is true, this is not a waiver of the warranty and there is no indication that defendant ever informed Capital that it waived the notice requirement. In fact, the evidence clearly establishes that Capital had been advised of the serious consequences which lack of notice might bring. In light of this, we must conclude that the warranty provision was not waived.

 This brings us to the plaintiffs' claim that an emergency existed and therefore the warranty was not breached. We must reject this contention as the evidence presented by plaintiffs was less than credible. If an emergency did exist, however, it was caused by a decision made by Bailey at a time when he was not the approved master of the vessel. Thus a breach of the warranty occurred when this decision was

14. Chism was subsequently listed as the named captain in the insurance policy in question which was issued on April 8, 1972.

made, and in light of this we do not feel that plaintiffs can bootstrap themselves into a situation where the warranty is to be disregarded.

■ Plaintiffs' final contention is that the warranty is inapplicable as the tug was not being operated by Bailey. In order to determine this issue, we must look to the purpose of the warranty. As previously mentioned, this purpose was to insure that a competent master would be in charge of the vessel. We believe that Witcher left Bailey with the tug, rather than one of the other crew members, as in a situation such as this the captain, normally at least, would be the most likely person to be entrusted with the responsibility of seeing that the pump was removed and the vessel did not sink. In light of this, we must conclude that Bailey was entrusted with the responsibility of operating the tug within the meaning of the warranty.

■ As we find the warranty was in force and breached by Capital, we must now determine if the breach releases defendant from liability. The general rule is:

> It is settled that a warranty in a contract of insurance must be literally complied with; that the only question in such cases is whether the thing warranted to be performed was or was not performed; and that a breach of the warranty releases the company from liability regardless of the fact that a compliance with the warranty would not have avoided the loss. Home Ins. Co. v. Ciconett, 179 F.2d 892 (6 Cir. 1950). See also Coffey v. Indiana Lumberman's Mutual Insurance Co., 372 F.2d 646 (6 Cir. 1967).

Thus we must conclude that, in addition to finding the CRISTIE unseaworthy, defendant was released from any liability due to the breach and plaintiffs therefore may not recover.

Counsel for defendant will prepare and present, after endorsement by counsel for plaintiffs, a judgment order in accordance with this memorandum opinion.