[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13690

_____

D.C. Docket No. 9:18-cv-81270-RAR

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

Plaintiff - Counter Defendant - Appellee,

versus

OCEAN REEF CHARTERS LLC,

Defendant - Counter Claimant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 6, 2021)

Before JORDAN, JILL PRYOR, and BRANCH, Circuit Judges.

JORDAN, Circuit Judge:

The Supreme Court held in *Wilburn Boat Co. v. Firearm's Fund Ins. Co.*, 348

U.S. 310, 316 (1955), that in the field of marine insurance state law should be applied

where there is no established federal maritime rule governing the issue at hand.  For over 60 years, *Wilburn Boat* has sown confusion with respect to the treatment of warranties in marine insurance policies.  *See, e.g.*, 2 Thomas Schoenbaum, Admiralty and Maritime Law § 19:15 (6th ed. 2020) (asserting that *Wilburn Boat* has "caused endless mischief"); Gerard J. Mangone, United States Admiralty Law 247 (1997) (noting that *Wilburn Boat* "has since troubled many maritime lawyers"); I Alex L. Parks, The Law and Practice of Marine Insurance and Average 13 (1987) ("*Wilburn [Boat]* cast the law of marine insurance into a state of turmoil.").

In this case the district court held on summary judgment that, under Eleventh Circuit precedent, federal maritime law requires strict compliance with captain and crew warranties in a marine insurance policy.  And because Ocean Reef Charters breached those warranties, there was no coverage for the loss of its yacht under a policy issued by Travelers Property Casualty Company.

Doing our best to make sense of *Wilburn Boat* and its progeny, we reverse. We conclude that there is no entrenched maritime rule governing captain or crew warranties, and that as a result Florida law applies to determine the effect of Ocean Reef's breaches.

**I**

2

As this is an appeal from the grant of summary judgment, our review is plenary, and we view the facts in the light most favorable to Ocean Reef Charters. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

**A**

This case concerns the demise of the *M/Y My Lady*, a 92-foot Hatteras yacht. Ocean Reef, the owner of the *M/Y My Lady*, insured it with Travelers for a one-year term from October of 2016 to October of 2017. The 2016-17 policy, a renewal of annual policies issued in the two prior years, contained two express warranties that are at issue in this case. First, the captain warranty required Ocean Reef to employ a full-time professional captain approved by Travelers: "It is warranted you employ a professional captain for the yacht . . . Such captain shall be full time and approved by us." Second, the crew warranty required Ocean Reef to have one full- or part-time professional crew member onboard: "You [shall] employ 1 full time or part time professional crew for your yacht[.]"

Ocean Reef purchased the 2016-17 policy through its insurance agent, Keen Battle Mead & Company, located in Homestead, Florida. Travelers negotiated and issued the policy through its producing agent, Hull & Company, based in Fort Lauderdale, Florida. Travelers delivered the policy to Hull at its Florida address and Hull in turn delivered the policy to Keen Battle in Hialeah, Florida. The policy

named Ocean Reef as the insured with a New York address, but listed Key Largo, Florida, as the primary mooring location for the *M/Y My Lady*.

Ocean Reef did not employ a professional captain for the *M/Y My Lady* in early September of 2017, when Hurricane Irma was heading towards Florida. Nor did it have any crew onboard.

Eyeing the impending storm, Richard Gollel—the named operator of the *M/Y My Lady*—contacted Michael McCall, his former captain (who had previously been approved by Travelers and who was then in Massachusetts). Mr. Gollel asked Captain McCall whether he could move the yacht to a more protected location from its mooring near Mr. Gollel's residence in Pompano Beach, Florida. Captain McCall initially agreed to the request, but, according to Ocean Reef, he changed his mind and advised Mr. Gollel that there was no way to move the yacht safely.

Mr. Gollel then sought permission to move the *M/Y My Lady* himself, but Hull (Travelers' agent) told Keen Battle (Ocean Reef's agent) that the yacht should not be moved. So Mr. Gollel did his best to secure the yacht by, among other things, adding extra fenders and mooring lines. The extra mooring lines proved ineffective when a year-old dock piling—to which the port bow line was attached—gave way as Hurricane Irma struck land on September 10-11, 2017. The yacht drifted onto other pilings and hit the sea wall, before eventually becoming holed and sinking at the dock. The damage resulted in a total constructive loss under the Travelers policy.

4

**B**

Shortly after the *M/Y My Lady* sank, and while she was still submerged, Travelers filed this lawsuit against Ocean Reef. Travelers denied coverage six weeks later, asserting that Ocean Reef had breached the captain and crew warranties in the policy.

Following discovery, the parties filed cross-motions for summary judgment. Travelers argued that federal maritime law requires strict compliance with express warranties in marine insurance contracts, and that a breach bars coverage even if it is unrelated to the loss. Ocean Reef countered that Florida's so-called "anti-technical statute" should instead apply, and that under that statute the breaches did not preclude coverage because they were unrelated to the loss. *See* Fla. Stat. § 627.409(2) ("A breach . . . does not void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured."). Ocean Reef presented lay and expert testimony that the failure to have a captain and crew did not increase the hazard to the *M/Y My Lady*, and that the yacht sunk due to the unforeseeable failure of the dock piling.

The district court granted Travelers' motion for summary judgment, concluding that "the Eleventh Circuit has fashioned an entrenched rule of admiralty: express warranties in maritime insurance contracts *must* be strictly construed in the

5

absence of some limiting provision in the contract." *Travelers Property Casualty Co. v. Ocean Reef Charter LLC*, 396 F. Supp. 3d 1170, 1176 (S.D. Fla. 2019). Ocean Reef appealed, and we set the case for oral argument.

## II

This case concerns the interpretation of a marine insurance policy, which gives rise to federal admiralty jurisdiction. *See Wilburn Boat*, 348 U.S. at 313; *St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1184 (11th Cir. 2009). "As this case lies in admiralty, federal maritime conflict of laws control." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1161 (11th Cir. 2009).

So what law do we apply to determine the effect of Ocean Reef's breaches of the captain and crew warranties? To figure out the answer, we look to the Supreme Court's frequently criticized decision in *Wilburn Boat*.

## A

Perhaps unsurprisingly, the facts in *Wilburn Boat* bore no resemblance to the clashes and controversies on the high seas that formed the basis of American admiralty jurisprudence. The case involved a houseboat located on an artificial inland lake between Texas and Oklahoma. *See* 348 U.S. at 311. The insurance policy included two warranties of relevance—one providing that the boat could not be sold or otherwise transferred, and another providing that the boat could be used only for private pleasure purposes. *See id.* Both warranties were breached, and the

6

boat was subsequently destroyed by a fire unrelated to the breaches. *See id.* The owner made a claim under the policy, which the insurer denied due to the breaches. *See id.* The owner argued that Texas law should determine the effect, if any, of the breaches, but the Fifth Circuit sided with the insurer. It held that federal maritime law applied, and that there was an established maritime rule requiring literal compliance with all express warranties in marine insurance policies. The owner's breaches, therefore, voided coverage. *See id.* at 312-13.

When the case came before it, the Supreme Court posed two questions: "(1) Is there a judicially established federal admiralty rule governing these warranties? (2) If not, should we fashion one?" *Id*. at 314. Answering those questions, the Court reversed and remanded for application of Texas law.

The Court first concluded that there was no established federal maritime rule "requiring strict fulfillment of marine insurance warranties," explaining that "[w]hatever the origin of the 'literal performance' rule may be, we think it plain that it has not been judicially established as part of the body of federal admiralty law in this country." *Id*. at 314, 316. The Court acknowledged that one of its early cases referenced a rule requiring strict compliance with marine warranties, but did not think that the case applied a federal maritime rule. *See id.* at 315 (discussing *Hazard's Administrator v. New England Marine Ins. Co.*, 33 U.S. (8 Pet.) 557, 580 (1834)).

Moving on to the second question, the Court declined to fashion a uniform federal rule governing breaches of warranties in marine insurance policies, and opted instead for the application of state law.  It considered adopting the old common-law rule requiring literal and strict compliance with warranties, but thought that rule was "harsh."  *Id*. at 320.  Noting that the choice as to what rule to adopt involved policy considerations best left to Congress, the Court concluded that it was going to "leave the regulation of marine insurance where it has been—with the [s]tates."  *Id.* at 322.

Justice Reed, joined by Justice Burton, registered a strong dissent in *Wilburn Boat*.  First, he asserted that English law and American law required strict compliance with marine insurance warranties.  *See id.* at 325-26 (citing English and American authorities). Second, he lamented the detrimental effect the Court's decision would have, including a lack of uniformity in federal maritime law. *See id.* at 327-28.  As he put it, "[s]tate authority, . . . although it may provide remedies, does not extend to changing the general substantive admiralty law."  *Id.* at 331. Third, he believed that the applicability of state law with respect to warranties would adversely affect the certainty needed by vessel owners and insurers: "What law is to govern—that of the [s]tate where the insurance contract was issued, the [s]tate of the accident, or the [s]tate of the forum?  It seems an unreasonable interference with maritime activity to allow the many states to declare the substantive law of marine insurance."  *Id.* at 334.  Fourth, he thought that the Court's decision could not be

8

limited to the unique facts in *Wilburn Boat*: "The considerations which lead me to favor a uniform rule are not changed simply because a relatively small boat was here involved, or the number of [s]tates through which it passed were few, or because its ultimate destination was a small lake." *Id.* at 334-35.

**B**

One problem with *Wilburn Boat*, as commentators have pointed out, is that it rests on a flawed premise. At the time the case was decided, "all the major admiralty [appellate courts in the United States] had long accepted the literal performance rule." 2 Schoenbaum, Admiralty and Maritime Law, at § 19:15. This rule derived from English common law and applied to all express warranties in marine contracts. *See id.* ("English law applied the rule of automatic discharge as a consequence of breach of warranty."). Indeed, the Supreme Court itself had referenced a rule of strict compliance with marine warranties in the early 1800s. *See Hazard's Administrator*, 33 U.S. at 583 (a misrepresentation that a ship was "coppered" would void the policy, and it was "immaterial in what way the loss may arise"). Another problem is that *Wilburn Boat* undermines uniformity in admiralty law. *See* Joel K. Goldstein, *The Life and Times of* Wilburn Boat*: A Critical Guide (Part II)*, 28 J. Mar. L. & Com. 555, 558 (1997) ("By holding that state law governed the issues presented, *Wilburn* frustrated the effort to create uniform law regarding marine insurance. In so doing, it represented a departure from the approach which animated

9

. . . earlier cases involving marine insurance."); Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 69 (2d ed. 1975) ("[I]t is hard to say what is to be governed by a federal maritime law, if the question of the effect of a breach of warranty in a marine policy is not so governed.").

*Wilburn Boat* poses difficult choice-of-law questions in cases involving breaches of express warranties. The Supreme Court denied the existence of a then-entrenched federal maritime rule on the subject, and declined to fashion a uniform maritime rule, while at the same time seemingly instructing courts in future cases to look to whether there exists such a rule. *See Wilburn Boat*, 348 U.S. at 316-18. So the challenge for us is to find a way to give meaning to the Court's opinion in express-warranty cases.

The Supreme Court has given us little help on the matter. In the 65 years since *Wilburn Boat* was decided, the Court has cited the case just 13 times. Only two of those cases are relevant here, and neither one dealt with an express warranty in a marine insurance policy.

In *Kossick v. United Fruit Co.*, 365 U.S. 731 (1961), the Supreme Court considered an alleged oral agreement by a shipowner to assume responsibility for any improper or inadequate treatment of a seaman at a public health hospital. The Court held that "several considerations point to an accommodation favoring the application of maritime law." *Id*. at 741. It distinguished but did not overrule

10

*Wilburn Boat*, noting that "[a] concurring opinion and some commentators have preferred to refer [that] decision to the absurdity of applying maritime law to a contract of insurance on a houseboat established in the waters of a small artificial lake between Texas and Oklahoma." *Id*. at 742 (citations omitted).  It then declared: "Needless to say the situation presented here has a more genuinely salty flavor than that." *Id*.

As a matter of linguistics, or even intuition, we are unsure what to make of this sentence in *Kossick*.  How "genuinely salty" is salty enough?  Where, for example, does a dispute stemming from an incident in brackish water fall on the scale?  *See American Dredging Co. v. Miller*, 510 U.S. 443, 452-53 (1994) (comparing *Wilburn Boat* and *Kossick*: "It would be idle to pretend that the line separating permissible from impermissible state regulation is readily discernible in our admiralty jurisprudence, or indeed is even entirely consistent within our admiralty jurisprudence.").  Whatever the precise meaning of *Kossick*, we concluded relatively quickly that it did not overrule *Wilburn Boat.  See Irwin v. Eagle Star Ins. Co.*, 455 F.2d 827, 829-30 (5th Cir. 1972) ("Despite the language in *Kossick* tending to limit the *Wilburn Boat* opinion to its facts, we believe that *Kossick* did an incomplete job of burying the *Wilburn Boat* obeisance to state contract law in certain cases involving marine contracts.").

11

In 2004, the Supreme Court cited *Wilburn Boat* for the principle that "not every term in every maritime contract can only be controlled by some federally defined admiralty rule." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 27 (2004) (quoting *Wilburn Boat*, 348 U.S. at 313). The Court went on to say that "[a] maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law," but added that "when state interests cannot be accommodated without defeating a federal interest . . . then federal substantive law should govern." *Id*. The *Norfolk Southern* choice-of-law formulation is obviously different than the one set out in *Wilburn Boat*. But *Norfolk Southern* involved a so-called Himalaya clause (which extends liability limitations to downstream parties) in a bill of lading, a very different issue than the breach of an express warranty in a marine insurance policy. We therefore do not think that *Norfolk Southern* constituted a stealth overruling of *Wilburn Boat*. *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

By not squarely addressing *Wilburn Boat* in the 65 years since its issuance, the Supreme Court has left the lower federal courts at sea without a rudder or compass. If we were writing on a blank slate, we would consider holding that there should be a uniform maritime rule regarding the effect of a breach of an express warranty in a marine insurance policy—and from there determine what that uniform

12

rule should be. *See generally DeLovio v. Boit*, 7 F.Cas. 418, 443 (C.C.D. Mass. 1815) (Story, J.) (noting the "advantages resulting to the commerce and navigation of the United States, from a uniformity of rules and decisions in all maritime questions"); 1 Benedict on Admiralty § 111 (7th rev. ed. 2020) (explaining that the "fundamental purpose" of the grant of admiralty jurisdiction was to "preserve adequate harmony and appropriate uniform rules relating to maritime matters" and to "bring them within the control" of the federal government); Goldstein, *The Life and Times of* Wilburn Boat, 28 J. Mar. L. & Com. at 557 ("[T]he uniformity idea has long antecedents regarding marine insurance.").

The slate, however, is not blank. It is covered in graffiti, and we must somehow make sense of the layers of paint.

## C

*Wilburn Boat* remains on the books, and we are bound by its treatment of warranties in marine insurance policies despite the ample criticism the decision has received. As we read *Wilburn Boat*, it instructs us "to look to see if the *specific* warranty at issue is (or should be) the subject of a uniform or entrenched federal admiralty rule." *Great Lakes Reinsurance (UK) PLC v. Rosin*, 757 F.Supp.2d 1244, 1257 (S.D. Fla. 2010). That is the way we interpreted *Wilburn Boat* early on. *See, e.g., Koninklyke Nederlandsche Stoomboot Maalschappy, N.V. v. Strachan Shipping Co.*, 301 F.2d 741, 743 (5th Cir. 1962) (observing that although *Wilburn Boat* "held

13

that marine insurance contracts should be governed by state law, there can be no doubt that a clearly established federal judicially-fashioned maritime rule governs a stevedore's breach of warranty to perform services in a workmanlike fashion"); *Fireman's Fund Ins. Co. v. Wilburn Boat Co.*, 300 F.2d 631, 647 n.2 (5th Cir. 1962) (explaining that *Wilburn Boat* "held that state law is to be applied in the field of marine insurance only where 'entrenched federal precedent is lacking' with respect to a specific issue").[1]

We recognize that there is language in some of our cases pronouncing the existence of an entrenched maritime rule as to the breach of all marine warranties. For example, in *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir. 1988), we said—without citing to or even acknowledging *Wilburn Boat*—that "admiralty law requires the strict construction of express warranties in marine insurance contracts," and that "breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss."  And in *Hilton Oil Transport v. Jonas*, 75 F.3d 627, 630

---

[1] Over the years, our cases discussing or applying *Wilburn Boat* have admittedly not been uniform. *See Rosin*, 757 F.Supp.2d at 1253-56 (surveying Fifth and Eleventh Circuit precedent through 2010); Graydon S. Staring, Wilburn Boat *is a Dead Letter: R.I.P.*, 42 J. Mar. L. & Com. 465, 478-82 (2011) (same).  Our sister circuits have also taken divergent approaches to *Wilburn Boat*.  *See* 8 Benedict on Admiralty, at § 12:03 (noting that "the lower courts have not been consistent" in applying *Wilburn Boat*).  For a sampling of post-*Wilburn Boat* cases in other circuits, see *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 40 F.3d 622, 627 (3d Cir. 1994); *Advani Enterprises, Inc. v. Underwriters at Lloyd's*, 140 F.3d 157, 162 (2d Cir. 1998); and *Lloyd's of London v. Pagan-Sanchez*, 539 F.3d 19, 24 (1st Cir. 2008).

14

(11th Cir. 1996), we similarly explained that the breach of an express maritime warranty deprives the insured of coverage under a "judicially established and entrenched federal admiralty rule," even if the breach is unrelated to the loss.

The district court relied on these cases to conclude that "the Eleventh Circuit has fashioned an entrenched federal rule of admiralty: express warranties in maritime insurance contracts *must* be strictly construed in the absence of some limiting provision in the contract." *Ocean Reef Charters*, 396 F. Supp. 3d at 1176. The district court's view is understandable given the mess we have created, but we cannot take the broad pronouncements in *Cooke's Seafood* and *Hilton Oil* at face value. Doing so would eviscerate *Wilburn Boat* and its holding that there is no established federal maritime rule requiring strict fulfillment of all warranties in marine insurance policies. *See* 2 Schoenbaum, Admiralty and Maritime Law, at § 19:15 (explaining that cases which hold that "the literal performance rule still applies to warranties as a matter of *federal* law. . . . choose to ignore the Supreme Court's mandate [in *Wilburn Boat*] that state law applies to insurance warranties").

As a subsequent panel, we accept and treat as binding the specific holdings in *Cooke's Seafood* and *Hilton Oil*, which are that the breach of a navigation limit warranty bars coverage as a matter of maritime law even when the breach is unrelated to the loss. *See Cooke's Seafood*, 835 F.2d at 1367; *Hilton Oil*, 75 F.3d at 630. There is, after all, authority for the proposition that there exists an entrenched

15

federal maritime rule governing navigation limit warranties.  *See generally Fla. Marine Towing, Inc. v. United Nat'l Ins. Co.*, 686 So.2d 711, 713 (Fla. App. 1997) ("Federal courts have recognized that . . . strict construction of navigational limit warranties has been an established admiralty rule of the federal judiciary.") (quotation omitted).

We decline, however, to read those cases as purporting to overrule *Wilburn Boat* with respect to the treatment of all warranties in maritime insurance policies. The Supreme Court, and only the Supreme Court, has the prerogative of overruling its own decisions.  *See Bosse v. Oklahoma*, 137 S.Ct. 1, 2 (2016).  Unlike some commentators, *see, e.g.,* Staring, *Dead Letter*, 42 J. Mar. L. & Com. at 484-85, we cannot scuttle *Wilburn Boat* just because we might disagree with it.  We instead harmonize *Wilburn Boat* with *Cooke's Seafood* and *Hilton Oil* by limiting the latter cases to the specific warranty they addressed.  *See Rosin*, 757 F. Supp. 2d at 1257. This approach may be messy and do little to solve the overall doctrinal confusion, but we think it is the only path open to us if we are going to be faithful to *Wilburn Boat*.[2]

---

[2] We note, as well, that before *Cooke's Seafood* and *Hilton Oil* we had confirmed in a number of cases that state law governs the interpretation of marine insurance policies unless there is an entrenched maritime rule on the particular issue at hand.  *See, e.g., Strachan Shipping*, 301 F.2d at 743; *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 147 n.18 (5th Cir. 1971); *Walter v. Marine Office of America*, 537 F.2d 89, 94 (5th Cir. 1976).  These earlier decisions also counsel against an expansive reading of *Cooke's Seafood* and *Hilton Oil*.

16

For the same reason, we narrowly construe *Aguirre v. Citizens Casualty Co. of New York*, 441 F.2d 141, 146 (5th Cir. 1971), which held that the breach of an express warranty of seaworthiness voids coverage even if unrelated to the loss because "[t]he seaworthiness standard is solidly entrenched in federal maritime jurisprudence."  We read *Aguirre* as applying an entrenched maritime rule with respect to seaworthiness warranties, *see* Thomas R. Beer, *Established Federal Admiralty Rules in Maritime Insurance Contracts and the* Wilburn Boat *Case*, 1 U.S.F. Mar. L. J. 149, 158-59 (1989) (stating that "[t]he standard of seaworthiness is solidly entrenched in American maritime law"), but do not understand it to hold that there is an entrenched federal maritime rule requiring strict compliance with all marine warranties.  Such a broad interpretation would, again, be contrary to *Wilburn Boat*.

**D**

As this case does not involve a navigation limit warranty or a seaworthiness warranty, *Cooke's Seafood*, *Hilton Oil*, and *Aguirre* do not control or dictate the outcome.  The precise questions for us under *Wilburn Boat* are whether there exist entrenched federal maritime rules governing captain or crew warranties.  The answer to those questions is no.

The two cases we have located addressing the breach of a captain warranty have each applied state law.  *See Yu v. Albany Ins. Co.*, 281 F.3d 803, 808-09 (9th

17

Cir. 2002) (Hawaii law); *Northern Assurance Co. of America v. Rathbum*, 567 F.Supp.2d 316, 319 (D. Conn. 2008) (Connecticut law). Although both of these cases alluded to a purported maritime rule of strict compliance with marine warranties, neither one adopted such a federal rule, and as we have noted such a broad rule would conflict with *Wilburn Boat*. A third case, *Capital Coastal Corp. v. Hartford Fire Ins. Co.*, 378 F. Supp. 163, 172 (E.D. Va. 1974), addressed the breach of a warranty requiring that the vessel be manned by a specific captain. The district court in *Capital Coastal* held that all warranties had to be literally fulfilled, and in support cited to two pre-*Wilburn Boat* cases from the Sixth Circuit—one applying federal maritime law and another applying state insurance law. *See id.* To the extent that *Capital Coastal* relied on a supposed entrenched maritime rule requiring strict compliance with all warranties in marine insurance policies, we do not give it much weight, as it did not cite or discuss *Wilburn Boat*. *Cf. Rosin*, 757 F. Supp. 2d at 1257 (holding that "there is no established and entrenched federal precedent concerning the effect of a breach of a 'named operator' warranty").

As for the crew warranty, we have found no American cases or authorities recognizing or announcing an entrenched maritime rule. There is, however, an old and often-cited English case which held that the breach of a crew warranty voided a marine insurance policy even though the breach was cured before the loss and was unrelated to the loss. *See DeHahn v. Hartley*, 1 T.R. 343, 345-46, 99 E.R. 1130

18

(K.B. 1786) (warranty required crew of at least 50 but ship initially sailed with 46). In the words of Chief Justice Mansfield, "[a] warranty in a policy of insurance is a condition or contingency, and unless that be performed, there is no contract." *Id.* For several reasons, *DeHahn* does not change our conclusion that there is no entrenched federal maritime rule governing breaches of crew warranties. First, Travelers does not claim that such an established federal rule exists. Second, in his *Wilburn Boat* dissent Justice Reed cited *DeHahn* to support his view that English law required strict compliance with warranties in marine insurance policies, *see* 348 U.S. at 325 n.1, but the majority was not persuaded by his contention. If *Wilburn Boat* held, in the face of cases like *DeHahn*, that there was no entrenched maritime rule in the United States requiring strict compliance with warranties in marine insurance policies, we do not think we can rely on *DeHahn* today as authority for such a rule with respect to crew warranties.

All of this means that Florida law, specifically Fla. Stat. § 627.409(2), governs the effect of Ocean Reef's breaches of the captain and crew warranties. On remand, the district court will need to apply § 627.409(2), and consider any other related arguments raised by the parties. *See generally Pickett v. Woods*, 404 So.2d 1152, 1153 (Fla. App. 1981) (explaining that § 627.409(2) was "designed to prevent the insurer from avoiding coverage on a technical omission playing no part in the loss"); *Eastern Ins. Co. v. Austin*, 396 So. 2d 823, 824-25 (Fla. App. 1981) (concluding that

19

the term "hazard" in § 627.409(2) "refer[s] to danger to the insured vessel itself"). It appears that, under Florida law, the burden of proving a breach and "a resulting increase of the hazard" is on the insurer. *See Fla. Power and Light Co. v. Foremost Ins. Co.*, 433 So. 2d 536, 536-37 (Fla. App. 1983).

**E**

As noted, the Supreme Court in *Wilburn Boat* considered the then-existing English rule requiring literal performance of marine warranties to be "harsh," 348 U.S. at 320, and some commentators have theorized that the Court's disdain for that rule led to its bewildering decision. *See* 2 Schoenbaum, Admiralty and Maritime Law, at § 19:15 ("There is evidence of another reason for [the *Wilburn Boat*] decision: dissatisfaction with the English law of warranties."). English law, however, has recently turned full circle and we take a moment to note the change on the other side of the pond.

The United Kingdom Insurance Act of 2015 abandoned the literal compliance rule, so that now "rescission is no longer the [automatic] remedy for breach of warranty." Hugh D. Baker, *Sailing to Calmer Seas: The United Kingdom Insurance Act 2015 and Its Potential Effect on United States Marine Insurance Markets and Law*, 41 Tul. Mar. L. J. 159, 180 (2016). Instead, a breach only suspends coverage until it is cured. *See* Insurance Act 2015, c.4 (U.K.), at §10. In addition, an insured who breaches a warranty and fails to cure can recover if it "shows that the non-

compliance with the term could not have increased the risk of the loss which actually occurred in the circumstances in which it occurred." *See id.* at § 11(3). If there are still "special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business," *Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co.*, 263 U.S. 487, 493 (1924), it will be interesting to see what effect the Act has on American maritime law (and on how *Wilburn Boat* is viewed). *See* 2 Schoenbaum, Admiralty and Maritime Law, at § 19:15 ("It is likely that the new U.K. law will encourage U.S. courts to formalize these doctrines."); Attilio M. Costabel, *The UK Insurance Act 2015: A Restatement of Marine Insurance Law*, 27 St. Thomas U. L. Rev. 133, 166 (2015) ("[T]he . . . Act will surely have influence on the law of marine insurance, both in the United States and at the home of the Act in the United Kingdom.").

### III

In the 1975 edition of their treatise on admiralty law, Grant Gilmore and Charles L. Black, Jr., wrote that "[i]t is utterly impossible to be at all sure . . . how the Supreme Court will at last resolve the[ ] perplexities and contradictions" created by *Wilburn Boat*. *See* Gilmore & Grant, The Law of Admiralty, at 70. Since then, more than 45 years have passed, yet we are no closer to an answer. Maybe, just maybe, this case will prove tempting enough for the Supreme Court to wade in and

21

let us know what it thinks of *Wilburn Boat* today. As they say, "[h]ope springs eternal . . . ." Alexander Pope, *An Essay on Man*, Epistle I, l. 95 (1733).

"It may be that *Wilburn Boat* was a bad (or at least badly written) decision." *Rosin*, 757 F. Supp. 2d at 1256. But we are stuck with it, and finding no established maritime rule governing captain and crew warranties, we hold that Florida law governs. We reverse the district court's order granting summary judgment to Travelers, and remand for further proceedings.

**REVERSED AND REMANDED.**